FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2012 15 P 1:48

CLE...
AL E...

| | |
|---|---|
| **PROFESSIONAL MASSAGE TRAINING CENTER, INC.,** a Missouri Corporation, 229 East Commercial Street, Springfield, MO 65803, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES D/B/A THE ACCREDITING COMMISSION  OF CAREER SCHOOLS AND COLLEGES** a Virginia Corporation, 2101 Wilson Boulevard, Suite 302, Arlington, Virginia 22201, | ) ) ) ) ) ) ) ) ) ) |
| **SERVE:** CT CORPORATION SYSTEM Registered Agent for the Accreditation Alliance of Career Schools and Colleges 4701 Cox Road, Suite 301 Glen Allen, VA  23060 | ) ) ) ) ) ) ) |
| Defendant. | ) ) |

Case No. _1:12CV911_
_LO/IDD_

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

Comes Now Plaintiff, **Professional Massage Training Center, Inc.**, d/b/a Professional

Massage Training Center ("PMTC" or "the School"), through its undersigned attorneys, and, for

its Verified Complaint for Declaratory and Injunctive Relief against Defendant, **Accreditation**

**Alliance of Career Schools and Colleges d/b/a The Accrediting Commission of Career**

**Schools and Colleges** ("ACCSC"), hereby alleges as follows:

## INTRODUCTION

1.    PMTC, a massage-therapy school located in Springfield, Missouri, seeks judicial review of the arbitrary and capricious decision of its institutional accrediting agency, ACCSC, to terminate its accreditation, without due process of law and in violation of ACCSC standards, effective July 11, 2012. In addition, in this action PMTC seeks damages from ACCSC as the result of ACCSC's breach of contract, its interference with PMTC's contractual relationships and an action based upon ACCSC's negligence. Despite PMTC ranking among the top in the nation with similar massage therapy schools in student graduation rates, employment of graduates, student-to-teacher ratio, student retention rates, and federal loan payback, ACCSC was determined to end PMTC's accreditation.  In doing so, ACCSC (1) failed to follow its own internal procedures requiring it to provide accrediting institutions such as PMTC an opportunity to remedy alleged areas of non-compliance with accreditation standards, (2) failed to consider and accept relevant evidence submitted by PMTC in response to its multiple duplicative and burdensome requests, (3) denied PMTC due process under the law, (4) failed to comply with 34 C.F.R. § 602.20(a) limiting the length of an accreditor's investigation, and (5) acted to terminate PMTC's accreditation in a vindictive and retaliatory manner.

2.    Because of ACCSC's illegal conduct, PMTC's students will no longer be eligible to receive funding from federal student aid programs under Title IV of the Higher Education Act of 1965, as amended 20 U.S.C. §§ 1070, et seq., (2004) ("Title IV Program Funding" or "Title IV Programs"), which is administered by the United States Department of Education ("the Department"). This decision will cause PMTC such severe financial distress that the school will be forced to close in the absence of relief.  Aside from the risk of closure, the decision will irreparably harm PMTC's goodwill and reputation in the educational community and make it

unlikely that current students will continue with their courses of study or that new students will enroll at PMTC.

## PARTIES

3.      PMTC is a Missouri corporation with its principal place of business in Springfield, Missouri. PMTC is the only institution of higher learning in Springfield, and within over a 100 mile radius, which provides Massage Therapy education. Founded in 1994 by Juliet Mee, PMTC has a current enrollment of 97 students.

4.      Upon information and belief, ACCSC is a Virginia corporation with is principal place of business in Arlington, Virginia. At all times relevant hereto, ACCSC is and has been an accrediting agency officially recognized by the U.S. Secretary of Education, pursuant to 20 U.S.C. § 1099b.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to the following statutes: (1) 28 U.S.C. § 1331, in that this is a civil action arising under the Constitution and laws of the United States, including under the federal common law; (2) 28 U.S.C. § 1343(a)(4), in that the Plaintiff seeks equitable relief under the Higher Education Act of 1965, as amended, 20 U.S.C. § 1099b(f), for the protection of its civil rights; (3) 20 U.S.C. § 1099b(f), providing exclusive federal jurisdiction for disputes with recognized accrediting agencies; (4) 28 U.S.C. § 1332 in that there is complete diversity of citizenship between PMTC and ACCSC and the amount in controversy exceeds $75,000; and (5) 28 U.S.C. § 1367, which provides this Court with supplemental jurisdiction over PMTC's state law claims.

6.     This Court has personal jurisdiction over ACCSC as a nonprofit corporation organized under the laws of the Commonwealth of Virginia, with its principal place of business in Arlington, Virginia.

7.     Venue for this action is proper in this judicial district and division under 28 U.S.C. § 1391(b) because the defendant resides within the Alexandria Division of the Eastern District of Virginia.

## GENERAL ALLEGATIONS

### I. Background on Accreditation and Irreparable Harm PMTC Will Suffer if ACCSC's Decision is Not Now Set Aside Pending A Ruling on the Merits.

8.     ACCSC is the institutional accrediting agency for private institutions of higher education such as PMTC and is recognized by the Department. PMTC has been accredited by ACCSC since November, 2000, and is assigned ACCSC school number M070395.

9.     PMTC enjoys broad support and an exceptional reputation among the Springfield public and business community. PMTC has also partnered with Drury University and Missouri State University ("MSU"), to provide PMTC's students full access to MSU's University library and to participate in Drury's Wellness Program. Attached hereto and made part hereof as **Exhibit A** are true and correct copies of letters of reference and recognition from the City of Springfield, Missouri, various entitles within the Springfield , Missouri community, MSU and Drury University.

10.     PMTC offers two non-degree programs: Clinical Massage Therapy and Spa Massage Therapy. The length of these programs varies between 8 to 12 months.

11.     PMTC has demonstrated above-average student outcomes. Compared to the ACCSC benchmark rates and the ACCSC national average rates, PMTC's numbers are impressive:

| Metric | ACCSC Average * | ACCSC Benchmark | PMTC 2011** |
|--------|------------------|------------------|--------------|
| Graduation | 69% | 54% | 75% |
| Placement | 82% | 70% | 97% |

*For programs 10-12 months in length, p. 110 of **Exhibit B**

** See, **Exhibit S** referenced below, **p. 23.**

12.     For a postsecondary educational institution to be eligible to participate in the Title IV Programs, it must be accredited by an accrediting agency recognized by the Department. *See* 20 U.S.C. § 1002 (A)(1)(a) & (B)(1)(d); 34 C.F.R. § 600.5 (6).

13.     To receive and retain accreditation, PMTC has complied with ACCSC's rules as described in ACCSC's *Standards of Accreditation,*

14.     The ACCSC *Standards of Accreditation* ("Standards of Accreditation") is a manual published by ACCSC setting forth the requirements for accreditation and by which member schools agree to be bound and which ACCSC agrees to apply impartially to all member schools. A true and correct copy of The *Standards of Accreditation is attached hereto and made part hereof as* **Exhibit B.**

15.     Loss of accreditation means that PMTC students will be ineligible to receive student aid funds under the Title IV Programs. Without this funding, PMTC is essentially without operating revenue and most students will not be able to continue to pay for their educational programs. PMTC will be forced to close unless ACCSC's arbitrary and capricious

decision to deny re-accreditation is stayed and hence its eligibility for Title IV Program Funding is restored.

16.     The closure of PMTC would disrupt the education and careers of its 97students currently enrolled, as well as the employment of 15 or so its faculty and staff.

17.     The public treasury will also be harmed if PMTC is forced to close precipitously. Federal law requires the federal government to forgive all Title IV Program loans made to students who are unable to complete their programs because their school has closed. 20 U.S.C. § 1087(c). On information and belief, the total of all federal loans for PMTC's existing students exceeds One Million and 00/100 Dollars ($1,000,000.00).

## II. ACCSC Issues the First Show-Cause Order.

18.     In late 2009, PMTC applied to renew its accreditation with ACCSC.

19.     On or about January 7, 2010, PMTC received a Show Cause Order, issued by ACCSC pursuant to 34 C.F.R. § 602.25(e), stating that ACCSC was concerned with the School's financial condition. A true and correct copy of the January 2010 Show Cause Order is attached hereto and made part hereof as **Exhibit C.** The Show Cause Order requested several financial documents and mistakenly referred to the School as "MCHS."

20.     PMTC responded to the January 2010 Show Cause Order by providing the documents ACCSC requested, including the financial statements, the School's budget projections, and updated official correspondence reflecting the status of the Department of Education's request.

21.     ACCSC issued a "continued Show Cause Order" on March 10, 2010, requesting additional financial information. A true and correct copy of the March 2010 Show Cause Order is attached hereto and made part hereof as **Exhibit D.**

6

22.     On May 17, 2010, PMTC provided additional documentation to show that it was continuing to comply with the Department of Education's line of credit request, including a copy of financial documents.

23.     On June 2, 2010 PMTC received a letter from ACCSC's Executive Director Dr. Michale McComis ("Dr. McComis") requesting more information regarding its financial condition.

24.     On June 21, 2010, PMTC provided ACCSC with evidence that it was in compliance with the Department of Education's line of credit request and provided proof of additional financial guarantees to demonstrate the School's financial solvency. This being the only basis for the original Show Cause order, PMTC concluded that it was fully in compliance and that its accreditation would be forthcoming.

### III. Dr. McComis Testifies Before the Senate

25.     On or about August 4, 2010, Dr. McComis testified on behalf of ACCSC before the United States Senate ("Senate") at a hearing of the Committee on Health, Education, Labor, and Pensions. During his testimony, Dr. McComis highlighted that the *Standards of Accreditation* "emphasize educational quality by focusing on outcomes." Dr. McComis also spoke out against "aggressive marketing schemes" that "lure" students to enroll "when those students may not be a good fit in relation to program objectives." A true and correct copy of the transcript of Dr. McComis' testimony before the Senate is attached hereto and made part hereof as **Exhibit F**.

26.     During this hearing, Dr. McComis viewed video evidence presented by the Government Accountability Office (GAO) showing allegedly fraudulent conduct by schools that ACCSC accredits, including ATI Enterprises, Inc. ("ATI"). This evidence was discussed in a

GAO Report first issued in August 4, 2010, entitled "For Profit Colleges, Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices." Dr. McComis was also questioned extensively by two Senators about ACCSC's continued accreditation of ATI in spite of both the alleged fraudulent conduct mentioned and the school's poor student outcomes. Over the course of the next 12 months, the Texas Workforce Commission ("TWC") would issue several formal directives and findings to ATI, ultimately culminating in a decision by WTC to withdraw licensure for 20 of ATI's programs. A true and correct copy of these TWC formal directives are attached and made part hereof as **Exhibit O**.

### IV. ACCSC Performed its First Team Site Visit and Vacated the Show-Cause Order.

27.     Just days after Dr. McComis was confronted at the Senate hearing with allegations of fraudulent actions by ATI, on August 9 - 10, 2010, ACCSC sent a team to perform an on-site evaluation of PMTC. The "Team Leader" for ACCSC during this visit was none other than Michael Ackerman, Executive Director of ATI, one of the several institutions whose integrity had been challenged by the GAO report. The timing of this visit was accelerated from the normal ACCSC process and occurred on fairly short notice and at a busy time for PMTC with two class starts. Ms. Mee questioned the timing but was told by an ACCSC staff member that it was necessary due to the schedule of the visiting team.

28.     During the team visit, in a lengthy conversation, Mr. Ackerman told Juliet Mee that her marketing manager was doing a poor job and that PMTC should fire him. Michael Ackerman also said to Juliet Mee that the school should be recruiting students more aggressively, including getting prospective students who tour the school to make an enrollment decision before leaving the school and to not wait to talk it over with family at home. He also told Ms. Mee to not discuss with prospective students the impact of a criminal background on

their prospects for obtaining licensure as a massage therapist. These are the kind of tactics Dr. McComis spoke out against in his August 4, 2010 testimony before the Senate Committee on Health, Education, Labor, and Pensions.

29.     On August 10, 2010, Juliet Mee spoke with Lisa Miles, the ACCSC manager of accreditation, to express ethical concerns regarding Michael Ackerman's suggestions of more aggressive marketing and student funding methods, and specifically stated that Mr. Ackerman's suggestions seemed to be the kind of practices that had been condemned in the Senate hearing.

30.     The ACCSC "Code of Conduct for Members of the On-Site Evaluation Team" (the "Code") states, among other things, that Team Members should not engage in employment "not compatible with the full and proper discharge of the responsibilities of the On-Site Evaluation Team" and should conduct themselves at the school  being evaluated in a manner consistent with " their best, impartial and unfettered judgment" and "[d]uring the on-site evaluation...shall conduct and comport themselves professionally, impartially and courteously." See, §§ 4 & 10-11. A true and correct copy of the Code is attached hereto and made part hereof as **Exhibit G.** Team leader Ackerman failed to meet these standards in several respects: his employment at ATI, whose operations were under open investigation for alleged fraud, rendered him unfit to serve on the team; his insistent recommendations to Ms. Mee of aggressive admissions tactics were unprofessional; and his criticisms of  PMTC's management of admissions, premised on methods used at ATI, were partial in nature and improperly skewed his judgment and lead to a team report that subjectively and improperly faulted  the adequacy of PMTC's management and administrative staff.

31.     On September 1, 2010, ACCSC vacated the Show Cause Order but "deferred" final action on PMTC's request to renew its accreditation.  In its letter, ACCSC requested more

9

financial documents and an update regarding the school's status with the Department of Education. A true and correct copy of the September 2010 Order is attached hereto and made part hereof as **Exhibit I.**

32. Under the ACCSC *Standards of Accreditation*, ACCSC may only remove a Show Cause Order if "the school's response gives evidence that such removal is warranted or if the response shows that the school complies with accreditation standards and requirements." **Exhibit B**, p. 45, Section VII, K (5)(a).

33. On October 11, 2010, PMTC responded to the September 1, 2010 letter and provided all of the documents specifically requested by ACCSC. A true and correct copy of the October 11, 2010 response is attached hereto and made part hereof as **Exhibit J.**

34. On September 23, 2010, ACCSC issued a "Team Summary Report" ("Team Summary Report") with the team's finding from the August, 2010 on-site evaluation. A true and correct copy of the aforesaid Team Summary Report is attached hereto and made part hereof as **Exhibit E.** This report, observed that the school employed "innovative teaching equipment," that "classroom instruction technology was more than adequate," and that "school representatives emphasize an adherence to ethical conduct, professional behavior, and proper client base development among the pillars of concepts that are offered to students."

35. The Team Summary Report also observed that 93% of the students it had surveyed "felt good about their decision to attend the school and 89% would recommend the school to a friend." *Id.* p. 5.

36. Notwithstanding, the September 23, 2010 Team Summary Report, for the first time, expressed that ACCSC was concerned with PMTC's ability to demonstrate "adequate

management capability, sufficient administrative capacity, and planning for future improvement." **Exhibit E**, p. 6. It said the School had not proven that it engages in "institutional assessment and improvement in comprehensive goal setting, benchmarking, and implementation activities." *Id.* It also said the school had not shown it engages in "faculty assessment and professional development activities." *Id.*

37.     The September 23, 2010 Team Summary Report also expressed concern that PMTC had not shown "that the continuity of instruction incorporates reasonable retention of the education administrative staff and faculty" or that "admission decisions are based on fair, effective, and consistently applied criteria," and that the School "did not demonstrate that it reports academic progress to students at regular intervals." *Id.* p. 7.

38.     On October 26, 2010, PMTC filed a comprehensive response to the Team Summary Report including extensive information on PMTC's exemplary student graduation and employment rates and compliance with the *Standards of Accreditation*.

**V.  ACCSC Issues the First Probation Order.**

39.     On December 8, 2010, ACCSC issued a "probation order," stating that the School would be "required to demonstrate corrective action and compliance with accrediting standards." A true and correct copy of the aforesaid probation order is attached hereto and made part hereof as **Exhibit K**.

40.     On March 15, 2011, PMTC timely provided an exhaustive response to the concerns presented in the Probation Order, totaling 1,256 pages, demonstrating compliance with the accreditation standards.  This response included provided extensive documentation regarding its (1) management and administrative capacity, (2) administrative development and training, (3) continuity of management, (4) consulting input, (5) financial structure and current cash flow

11

status, (6) proof of compliance with Americans With Disabilities Act, (7) Institutional

Assessment and Improvement Planning, (8), a Faculty Improvement Plan, (9) continuity of

instruction, (10) proof of compliance with ACCSC standards relating to admission requirements,

(11) proof of a Program Advisory Committee, (12) proof of PMTC's Learning Resource System

(LRS), (13) verification of past work experience of PMTC's faculty, and (14) additional

documents showing PMTC was in compliance with ACCSC's probation requirements.

41.     On June 8, 2011, after reviewing PMTC's voluminous response, Dr. McComis

issued a letter stating that the Commission had voted to vacate the probation order, but again

continued to defer a decision on PMTC's request for accreditation. A true and correct copy of the

aforesaid June 8, 2011 letter is attached hereto and made part hereof as **Exhibit M.**

42.     Under the *Standards of Accreditation*, a Probation Order could only be vacated "if

the school's response gives evidence that such removal is warranted or if the response shows that

the school complies with accreditation standards and requirements." **Exhibit B**, p. 47, Section

VII, L (5)(a).

43.     Dr. McComis's June 8, 2011 letter stated that although the first Show Cause

Order and the Probation Order had been vacated, ACCSC continued to harbor concern with "the

adequacy of the school's management given PMTC's inability to correct essential areas of

noncompliance." See, **Exhibit M**, p. 2. Although PMTC had complied with all of the requests of

ACCSC in the show cause and probation proceedings and had provided all of the documents

ACCSC had requested, ACCSC's displeasure was personal, directed not at the quality of the

school, but at the management, i.e. Juliet Mee.

44.     On June 23, 2011, ACCSC conducted a second on-site review at PMTC. During

this review, PMTC provided the ACCSC team with two binders of documentation providing a

further response to the very general and broad adequacy of management concern expressed by Dr. McComis in his June 8, 2011 letter.

45.     On August 25, 2011, ACCSC provided PMTC with the Team Summary Report resulting from the June 23, 2011 on-site evaluation (the "2011 Report"). A true and correct copy of the 2011 Report is attached hereto and made part hereof as **Exhibit P.**

46.     The 2011 Report disclosed that the ACCSC investigation, and specifically the June 23, 2011 site visit, had been targeted in nature – i.e., that the team had been "directed primarily to focus on reviewing" PMTC's "management, institutional assessment and improvement planning, learning resource system, and verification of faculty qualifications." *Id.* p. 4. Student success and attitudes, achievement, outcomes, graduation rate, employment rate, and default rate were not evaluated.

47.     The 2011 Report complained that Juliet Mee's "experience" in managing a postsecondary educational institution was "limited to her operation of Professional Massage Training Center," without noting that she had operated PMTC as its owner and director since 1994 and that ACCSC had accredited the school with her as the Director in 2000 and in 2006. The 2011 Report said Juliet Mee was "challenged" to find a "qualified director" to "enhance the school's management." *Id.* p 8. And yet the Report, inexplicably and inconsistently, observed that the current management team appeared to be "would appear to be sufficient." *Id.* p. 8.

48.     The 2011 Report recognized that the School had presented evidence of a "comprehensive" plan addressing "all areas required by ACCSC's accrediting standards," and it described "diligent effort over the last three months by Ms. Mee and another employee April Durnell." *Id.* p. 10.

13

49.     Regarding the institution's Learning Resource System ("LRS"), the 2011 Report observed that it was "easily and readily accessible beyond classroom hours" and that, of those students who the team had questioned, "92% of the students responded that the learning resource system is useful for completing required assignments, materials are available when needed, and readily accessible during and beyond classroom hours." *Id.* p. 14.

50.     On the issue of verification of faculty prior work verification, the 2011 Report observed that "the school had attempted to complete verification forms for all prior work experience of faculty, including the employment that was unrelated to the subjects taught." But the 2011 Report also noted that PMTC had not verified prior work for a faculty member when his or her prior employer was "out of business." *Id.* p. 15.

51.     The team interviewed students on their opinion about the quality of education they were receiving, and "100% of those surveyed indicated they felt good about their decision to attend the school and 100% would recommend the school to a friend." *Id* p. 17.

52.     Nonetheless, the 2011 Report asserted that PMTC had *not* demonstrated that it had "adequate management in place," that its "institutional assessment and improvement activities" were "significant and ongoing experiences in the school," that the School's LRS was adequate, that the faculty was qualified, and that "the financial structure of the school is sound." *Id.* p. 17

53.     On October 8, 2011, PMTC timely responded to the 2011 Report with 1,269 pages of additional evidence and documentation which thoroughly demonstrated its substantial ongoing efforts to comply with the requests of ACCSC. This document outlined and responded to each of the causes for concern that ACCSC had cited in the 2011 Report and established that PMTC was in compliance with the ACCSC standards at issue.

## VI. Second Probation Order

54.     On December 7, 2011, ACCSC sent a second "probation order" to PMTC, stating

that, although PMTC had already been taken off of probation, ACCSC had voted to place PMTC

"back on probation." A true and correct copy of the December 7, 2011 "probation order" is

attached hereto as **Exhibit Q.** Dr. McComis explained that PMTC would need to take "necessary

corrective action" to resolve ACCSC's concerns. *Id.* at 3. The letter failed to mention at all the

positive observations of the on-site evaluation team contained in the 2011 Report.

55.     This December, 2011 probation letter requested yet further documentation on the

school's management structure, another copy of the School's Assessment and Improvement

Plan, more evidence of implementation of the LRS (which 92% of the students surveyed by the

second visit team said was accessible and useful), and more evidence that the school had verified

prior work experience, even for those employees whose former employers had closed or no

longer kept such records.

56.     On December 20, 2011, Juliet Mee met in person in Washington D.C. with Dr.

McComis, Christopher Lambert, and Sean Forman of ACCSC to discuss the probation order and

to try to determine exactly what ACCSC wanted to receive from PMTC in order to finally

acknowledge that PMTC is fully in compliance with ACCSC accreditation standards in the

ACCSC Manual. At this meeting, Christopher Lambert communicated to Juliet Mee that the

probation order was issued to make sure that ACCSC had Juliet's attention.

57.     At the same meeting Juliet Mee informed ACCSC that the School had terminated

the employment of April Durnell and Becky Cox and replaced them with Jeremy Beatty to focus

on administration and compliance and Linda Mayhugh to focus on curriculum, operations, and

teaching. Christopher Lambert said it would "go a long way" in the minds of the Commissioners

if Jeremy Beatty and Linda Mayhugh attended ACCSC's Reaccreditation Meeting in Washington, DC in January, 2012.

58. At the December 20, 2011 meeting, Juliet Mee received assurances, from Dr. McComis and Christopher Lambert, that PMTC's plans for its LRS were sufficient to meet the accrediting standards. Dr. McComis also stated that Ms. Mee that she had answered most of ACCSC's questions.

59. In January, 2012, Jeremy Beatty and Linda Mayhugh attended ACCSC's Reaccreditation Meeting in Washington, D.C., as per the December 20, 2011 suggestion by Christopher Lambert. At the January, 2012 ACCSC meeting, Jeremy Beatty and Linda Mayhugh introduced themselves to Christopher Lambert (who said to both of them that he felt there was nothing that ACCSC could not work through with PMTC).

60. On January 10, 2012, PMTC responded to the second "probation" order by providing all of the documents ACCSC had requested, totaling 443 pages.

### V. Final Decision of the Commission to Deny Accreditation

61. On March 7, 2012, despite the assurances of Dr. McComis in December 2011 and of Mr. Lambert in January 2012, the ACCSC Commission issued a final decision ("Final Decision"). A true and correct copy of the aforesaid Final Decision is attached hereto and made part hereof as **Exhibit R.** The Final Decision lists the same four (4) reasons for denying PMTC re-accreditation as were listed in the December 7, 2011 Probation Order:

      a.      Continuity of management and administrative capacity through reasonable retention of management and administrative staff;

      b.      Failure to demonstrate "full time on-site supervision by an individual or team that has the demonstrated ability to lead and manage the institution."

c.  Failure to demonstrate that the "Learning Resource System" was managed by "qualified school personnel with sufficient experience to provide oversight and supervision;" and

d.  Failure to verify the prior work experience of faculty members and administrators.

As PMTC demonstrated in its appeal to an ACCSC appeal panel and as outlined below in this Complaint, PMTC was in compliance with these broad standards, when applied with appropriate consideration of the size and disciplinary focus of PMTC, and ACCSC's findings to the contrary represented an arbitrary and capricious application of its standards reached through a process that suffered from the improper influence of Mr. Ackerman and an improper bias against Ms. Mee.

### VII. Appeal to ACCSC Appeal Panel

62.    On April 17, 2012, PMTC timely filed its appeal with the ACCSC appeal panel, setting forth its grounds for appeal and extensive supporting documentation previously submitted to ACCSC by PMTC. A true and correct copy of the aforesaid appeal is attached hereto and made part hereof as **Exhibit S.**

63.    On May 11, 2012, PMTC presented argument before the Appeal Panel that the decision to deny accreditation was arbitrary and capricious, was inconsistent with ACCSC's policies and procedures, and had denied PMTC due process. In another process irregularity, the ACCSC staff somehow failed to deliver to the appeal panel the notice of appearances that PMTC had sent almost a month earlier to ACCSC, and the appeal panel chairman expressed surprise to learn on the day of the hearing that PMTCs counsel was a lawyer who in the past had performed work for his school. While PMTC confirmed that it saw no disabling conflict from this and the

17

hearing went forward, this odd communication breakdown started the hearing off on an unsettling note.

### VIII. ACCSC Appeals Panel's Grounds For Denying Appeal.

64. On July 11, 2012, ACCSC issued its final decision, stating that the appeals panel had denied the School's appeal. A true and correct copy of the aforesaid appeal panel decision is attached hereto and made part hereof as **Exhibit T.**

65. First, the panel stated that the School lacked "Continuity of Management and Administrative Capacity." See, **Exhibit T**, p. 12. It stated that this concern first arose at the "on-site evaluation of the school … in August of 2010," when Michael Ackerman was Team Leader. *Id.* p. 13. Juliet Mee has been the School's Director "continu[ously]" since 1994. See, Affidavit of Juliet Mee attached hereto and made part hereof as **Exhibit H.** The Appeal Panel did not reference or discuss the School's organizational chart, or discuss what degree of "turnover" was "reasonable" at a school with the size and disciplinary focus of PMTC. A true and correct copy of PMTC's organizational chart was included at page 64 in PMTC's Application for Appeal which is attached hereto and made part hereof as **Exhibit S.** On this ground, ACCSC did not mention the August, 2011 Team Summary Report, which showed that students gave the School exceptional marks under the category of "Faculty." See, **Exhibit P**, Tally Sheet A.

66. Second, ACCSC stated that the School lacked "Full-Time On-site Supervision." See **Exhibit T**, p. 15. The decision said that, of the four-person Administrative team consisting of Juliet Mee, Director, Jeremiah Mee, Director of Finance; Jeremy Beatty, Compliance Administrator; and Linda Mayhugh, Curriculum Administrator, two administrators were individually unqualified, "Jeremy Beatty and Linda Mayhugh." *Id.* In discussing Jeremy Beatty, the ACCSC decision discussed only his prior work experience. *Id.* It did not mention that

Jeremy Beatty had 1.5 years experience at PMTC prior to being hired as an administrator. **Exhibit S**. p. 12. The decision did not mention that the *Standards of Accreditation* allow for a School to hire faculty even without "prior training or experience" as long as "the school ... provide[s] training before the faculty member assumes primary instructional responsibilities in any classroom, curriculum, laboratory, or program related training." See, **Exhibit B,** p. 81.

67.     Regarding Linda Mayhugh, Curriculum Administrator, the decision stated that Ms. Mayhugh's experience in the field of Massage Therapy was "unrelated" to the task of developing curriculum for a Massage Therapy school. See, **Exhibit T,** p. 15. The decision also did not mention that the *Standards of Accreditation* permit a School to hire faculty without "prior training or experience" as long as "the school ... provide[s] training." **Exhibit B,** p. 81. The decision did not mention or discuss Ms. Mayhugh's five years of experience as an instructor for PMTC or whether this amounted to experience sufficient to direct curriculum at single discipline school. *Id.* Regarding the courses Ms. Mayhugh has taken in "curriculum development," **Exhibit,** p. 12, the decision stated that PMTC had failed to prove how these courses "have prepared her to be the Curriculum Administrator." See, **Exhibit T,** p. 16. The decision did not discuss Ms. Mayhugh's attendance at the ACCSC reaccreditation meeting in January 2012 at the request of ACCSC staff. See, **Exhibit S,** p. 13; **Exhibit H** ¶ 28.

68.     Aside from the decision's individual findings on Linda Mayhugh and Jeremy Beatty, the decision did not discuss ACCSC's *Standards of Accreditation*, which permit a school to be managed by an "*individual or team* with the appropriate combination of education, experience, and demonstrated ability to lead and manage a post-secondary educational institution." See, **Exhibit B,** p. 72. Notably, the decision did not take issue with the qualifications of Juliet Mee, the School's Director, or Jeremiah Mee, the Director of Finance.

69.     Third, the decision stated that the Learning Resource System (LRS) was not "managed by qualified school personnel" because Greg Holman, a professional librarian, was only employed part-time to manage the LRS. See, **Exhibit T**, p. 16. The decision failed to note where in the *Standards of Accreditation* an LRS manager was required to work full time, nor did it discuss the size of the school relative to the LRS requirement. The decision also failed to mention or discuss the letter from Missouri State University confirming that all of PMTC's students have full access to the Missouri State University library, and it did not discuss whether the Missouri State University library is an adequate resource for PMTC's students. **Exhibit S**, p. 105. The decision also failed to discuss the August, 2011 Team Summary Report describing the LRS as "easily and readily accessible" and that "92% of the students responded that the learning resource system is useful for completing required assignments, materials are available when needed, and readily accessible during and beyond classroom hours." See, **Exhibit P**, p. 14.

70.     Fourth, the decision stated that PMTC had failed to verify the work experience of its faculty. See, **Exhibit T**, p. 17. It said that two of PMTC's faculty, Jason Back and Brittany Anderson had not been verified, *id*, and that two other faculty members, Tracy Maxfield and Melanie Elliott, did not have three years of related practical work experience. *Id*.

71.     Regarding Melanie Elliott, ACCSC expressed concern that PMTC had not verified prior employment at a business that had since closed. *Id.* The decision failed to discuss the documents provided by PMTC in response to the August, 2011 Team Summary Report, including proof Melanie Elliott worked for Zen3 Body Works for two years, that she had worked for a quadriplegic client from 2005 to 2011, and that she had taken 96 hours of continuing education. See, **Exhibit V**, p. 1-5.

72.     Regarding Tracy Maxfield, ACCSC stated that PMTC had offered "absolutely no

evidence" that Mr. Maxfield's education or experience "qualified him to teach Kinesiology."

**Exhibit T** to Memorandum, p. 17. The decision did not mention Mr. Maxfield's experience as a

massage therapist for "In Balance Neuromuscular Therapy," See, **Exhibit S**, p. 233; See, **Exhibit**

**Q**, p. 9. The decision did not reference the documents provided by PMTC in response to the

August 2011 Team Summary Report, including documentation of Mr. Maxfield's completion of

Kinesiology coursework. **Exhibit V**, p. 6-14. Nor did the decision mention that Mr. Maxfield has

been approved to instruct Business, Ancillary / Kinesiology by the Coordinating Board for

Higher Education and the Missouri Board of Therapeutic Massage. It did not mention the

documents provided by PMTC in response to the December, 2011 probation order showing that

Mr. Maxfield is a licensed Pilates instructor. A true and correct copy of Mr. Maxfield's licensed

status is attached hereto and made part hereof as **Exhibit W.**, p. 1-4.

73.     Regarding Brittany Anderson, the decision only spoke to one of Ms. Anderson's

references, stating that PMTC did not "make clear to the Commission that Elaina Coatney is the

owner of Alaina's Relaxation Therapy." See, **Exhibit T**, p. 17.  The decision failed to mention

the documentation provided in response to the December, 2011 probation order indicating that

Ms. Anderson had worked since 2008 for "Heart of Touch," See, **Exhibit W**, p. 2, for "Elements

Therapeutic Massage for seven months, *Id.* p. 5, or that she worked for "ART STUDIO

Massage" from 2007 to 2009. *Id* p. 7.

74.     Regarding Jason Back, the panel decision stated that the School "did not identify"

Mr. Back's references or "furnish the documentation to the Commission" other than a reference

for "Midstate College." See, **Exhibit T**, p. 17.  The decision did not mention documentation

provided by PMTC in response to the August, 2011 Team Summary Report indicating that

PMTC had verified Jason Back's employment for "Durbin Chiropractic" from June, 2008 to August, 2009, **Exhibit V**, p. 15, and for "Chiropractic and Spinal Rehab" from June, 2006 until December, 2007. **Exhibit V**. p. 16. The decision did not mention the documents provided by PMTC in response to the August, 2010 Team Summary Report, including Jason Back's resume and references dating back to 1998, **Exhibit X**, p. 1-3, his Missouri licensure as a Chiropractic physician, *Id*. p. 5, his licensure by the Missouri Board of Therapeutic Massage to teach "pathology and kinesiology," *Id*. p. 9, or his documentation of extensive professional development and continuing education. *Id* p. 12-37.

75.     Finally, the Appeals Panel rejected PMTC's argument that its student outcomes and its size should be factors for consideration. See, **Exhibit T**, p. 12. Instead, ACCSC claimed it was bound by federal regulations and its own policy to apply its *Standards of Accreditation* intransigently, without regard for student outcomes or school size and disciplinary focus

76.     On this ground, the ACCSC decision did not discuss the statutory command that the agency's standards should be designed to assess "success with respect to **student achievement**" and "**fiscal** and **administrative capacity** as **appropriate to** the specified **scale** of operations." *See* 20 U.S.C. § 1099b (a)(5)(A) & (E)(emphasis added).

77.     The ACCSC decision also did not discuss 34 C.F.R. § 602.16(f), which states that "[n]othing in paragraph (a) ... restricts an institution from developing and using institutional standards to show its success with respect to **student achievement, which achievement may be considered as part of any accreditation review**." *Id*. (emphasis added)

78.     Finally, ACCSC failed to note that its own policies and procedures permit ACCSC to "waive the application of certain accreditation standards and/or procedures," if

"educational quality will be promoted and the interests of students will be protected." **Exhibit B**, p. 55-56, Section IX.

79.     Under relevant federal regulations, by reason of ACCSC's final decision to not renew PMTC's accreditation, PMTC lost its Title IV eligibility on July 11, 2012. *See* 34 C.F.R. §§ 600.41 (a)(1) & 668.26 (a)(2).

80.     Notwithstanding the loss of Title IV eligibility and participation, PMTC had expected to receive payment from the Department for federal aid earned by PMTC students prior to July 11, 2012 but not yet paid by the Department of Education. PMTC also expected that many of its students would qualify for 'teach-out' aid, i.e., additional disbursements of federal aid under prior awards that had not been fully earned by July 11, 2012 but which were thereafter earned by students who remained in school and made appropriate progress in their academic programs.

81.     On July 30, 2012, PMTC received an "Emergency Action" letter dated July 27, 2012 from the Department which stated that PMTC would not be receiving any further Title IV aid, including any 'teach-out' aid that might be earned by PMTC students. A true and correct copy of the aforesaid letter is attached hereto and made part hereof as **Exhibit Z**. Since that time, PMTC and its attorneys have engaged in extensive communications with counsel for the Department in an effort to have the Emergency Action letter rescinded and to have Title IV funds paid to PMTC, but thus far the Department has not changed its position and PMTC has not received any federal aid funds since July 19, 2012 when it was paid for some of the federal aid earned by its students prior to July 11, 2012.

82.     As a result of the ACCSC decision and the directly related actions of the Department, PMTC's cash reserves are increasingly being eroded and the School will not be able

to remain open much longer unless the ACCSC accreditation decision is rescinded and remanded for further proceedings, which would enable PMTC to regain its Title IV eligibility and resume receiving funds. Unless the Court acts to grant injunctive relief to stay the decision of ACCSC, PMTC, its students, its employees and the community of Springfield, Missouri will suffer irreparable harm with the closure of a longstanding massage therapy institution upon which the community of Springfield and the surrounding area has relied.

## COUNT I

## DENIAL OF DUE PROCESS AND FAILURE TO

## FOLLOW AND APPLY ACCSC STANDARDS

83.     PMTC hereby restates and incorporates by reference each and every one of their allegations set forth in paragraphs 1 through 82 of this Verified Complaint, as though fully set forth herein.

84.     ACCSC, as an accrediting body, must "demonstrate that the procedures it uses throughout the accrediting process satisfy due process." 34 CFR § 602.25. *Accord* 20 U.S.C. §1099b (a)(6).

85.     Due process requires an agency to provide "clear standards for an institution or program to be accredited" use "procedures that afford an institution or program a reasonable period of time to comply," provide "written specification of any deficiencies," provide "sufficient opportunity for a written response by an institution or program regarding any deficiencies identified by the agency," notify the institution in writing of adverse action, and provide an opportunity to appeal adverse action. 34 CFR § 602.25(a). *Accord* 20 U.S.C. §1099b (a)(6).

86.     The accrediting agency's standards should be designed to assess "success with respect to **student achievement**" and "**fiscal** and **administrative capacity** as **appropriate to** the specified **scale** of operations." 20 U.S.C. §1099b (a)(5)(A) & (E)(emphasis added).

87.     ACCSC, upon the complaint made by Ms. Mee to Lisa Miles about team leader Michael Ackerman's insistent recommendations of aggressive and questionable admissions practices and his related criticisms of PMTC management, should have terminated the August 2010 site visit, reconstituted the team and re-scheduled the site visit. By failing to do so and by later accepting the team's factual conclusions about alleged deficiencies in PMTC's management and administrative staff and ultimately deciding to not renew PMTC's accreditation on that basis, ACCSC acted on the basis of flawed and biased judgments, in violation of ACCSC  standards and due process requirements under federal regulations.

88.     ACCSC, in denying accreditation, refused to evaluate the factors its own policies and procedures noted is most important: <u>student outcomes</u>.  ACCSC also failed to evaluate PMTC's management and administrative capacity from the perspective of what is "appropriate to the specified scale of operations" at PMTC. 20 U.S.C. §1099b (a)(5)(E).

89.     Instead, ACCSC stated in its March 7, 2012 and July 11, 2012 accreditation denial decisions that it believed it was obligated to rigidly apply a list of other various factors wholly unrelated to student success, and it cited 34 C.F.R. § 602.16(a) for this opinion.

90.     In its decision, ACCSC said there was "nothing in the Department's regulations" and "no provision of ACCSC's *Standards*" that permits the agency to "ignore compliance with individual accreditation standards because an institution's outcomes are good." These statements are false, because they do not correctly acknowledge that ACCSC standards both permit and

expect an assessment of the adequacy of an institution's management, administrative staff and faculty to include consideration of student outcomes.

91.     In addition, the ACCSC Standards of Accreditation include an entire section on ACCSC's ability to "waive the application of certain accreditation standards and/or procedures," but says it will only do so if "**educational quality** will be promoted and the interests of students will be protected." See **Exhibit B**, p. 55-56, Section IX (emphasis added).

92.     The preamble to the ACCSC Manual notes that the *Standards* "set[] forth the base of essentials (i.e., standards of best practice) against which a school studies and evaluates itself" and that "[e]ach school determines its own educational objectives, keeping in  mind, however, that such objectives must be  appropriate for a postsecondary-educational institution and serve to **support the success of students**." **Exhibit B**, p. 1. ACCSC's website proclaims that its "mission is to serve as a reliable authority on educational quality and to promote educational opportunities for students...." A true and correct copy of ACCSC's website is attached hereto and made part hereof as **Exhibit Y**.

93.     As recently as June 29, 2012, ACCSC published an "Accreditation Alert" which said that its *Standards of Accreditation* generally "attempt to take into account a broad spectrum of factors that contribute to **student learning and achievement** and attempt to provide institutions with **multiple methods to demonstrate the success of students**," encouraging schools to use "various tools as a means to enhance student assessment and achievement and to express student success." A true and correct copy of the July 29, 2012 "Accreditation Alert" is attached hereto and made part hereof as **Exhibit U**.

94.     ACCSC's final decision does not comply with federal regulations governing accreditation.  ACCSC purported to rely on 34 C.F.R. § 602.16(a) for its statement that "nothing

in the Department's regulations" allow it to do anything but apply its list of rigid factors. However, 34 C.F.R. § 602.16(f) states that "[n]othing in paragraph (a) … restricts an institution from developing and using institutional standards to show its success with respect to **student achievement, which achievement may be considered as part of any accreditation review**." *Id.* (emphasis added)

95.     ACCSC also failed to follow its own policies relating to work experience of faculty.

96.     The *Standards of Accreditation* allow for a School to hire faculty even without "prior training or experience" as long as "the school … provide[s] training before the faculty member assumes primary instructional responsibilities in any classroom, curriculum, laboratory, or program related training."

97.     As outlined in the many submissions it made to ACCSC at its request, PMTC provided faculty training and ongoing professional development. ACCSC did not discuss in its decision whether any of the staff it mentioned were unqualified or whether the training they received by PMTC factored into its decision. Rather, the decision is silent on the question of post-hire training or whether the time faculty has spent employed at PMTC should be considered in determining their level of training and experience. Because ACCSC's own *Standards of Accreditation* permit an institution to hire faculty without prior training or experience, it was arbitrary and capricious for ACCSC to cite as a basis for denial of accreditation that PMTC's faculty lacked the requisite training or experience at the time of hiring.

98.     ACCSC also failed to follow its own policies and procedures regarding PMTC's "Learning Resource System" ("LRS"), in that it required a more exacting standard for this requirement beyond what is listed in the *Standards of Accreditation*. ACCSC complained that

Greg Holman, PMTC's LRS manager, only worked part-time. Yet, the *Standards of Accreditation* say nothing about whether a school's LRS manager must work full-time or may instead work part-time. ACCSC also ignored the positive survey response of 92 % of surveyed PMTC students and the supportive letters from nearby traditional universities, Drury University and Missouri State University.

99.    ACCSC also erroneously cited PMTC's description of its LRS as a "work in progress" as a basis for denial of accreditation. In fact, the section of the *Standards of Accreditation* on "Probation" says "The school will be deemed to have demonstrated good cause if it has shown that during the period of review significant progress has been made toward achieving compliance with the accreditation standard(s) in question." ACCSC made no attempt to explain why it could punish PMTC for describing its LRS in January, 2012 as a "work in progress" when ACCSC only issued its probation order commenting on alleged about the deficiencies in PMTC's LRS in December, 2011 and when its rules seem to *reward* progress.

100.    ACCSC failed to follow its own policies with respect to evaluating the "full-time on-site supervision." ACCSC claimed to be specifically concerned with Juliet Mee, highlighting what ACCSC alleges to be her lack of management experience. Yet ACCSC has failed to acknowledge that it has accredited the school since 2000 with Juliet Mee as its Director and that she has no less than 17 years of experience managing and directing PMTC since its founding in 1994.

101.    The ACCSC Standards *of Accreditation* state that a School can employ an "individual or team" with a combination of experience, meaning that no single individual must possess all of the qualifications that would be required to manage all aspects of the school's operations. **Exhibit B**, p. 64. The ACCSC decision did not discuss whether one individual was

specifically qualified or whether the "team" was qualified cumulatively but focused individually on two of the management team members, stating that they were not individually qualified. In this way, ACCSC failed to apply its own policies and procedures to the detriment of PMTC.

102.     ACCSC refused to comply with the regulations governing the length of accreditation review. Pursuant to 34 C.F.R. § 602.20(a)(2)(ii), an agency that finds an institution is not in compliance must "initiate adverse action" or "require the institution" to take appropriate corrective action "within a time period that must not exceed ... Eighteen months, if the program, or the longest program offered by the institution, is at least one year, but less than two years, in length."

103.     ACCSC's two-year investigation into PMTC, wherein PMTC fully complied with every document request from ACCSC and demonstrated that the ACCSC show cause orders and initial probation orders should be lifted, exceeded the "Eighteen months" limitation of the regulation.

104.     ACCSC refused to consider all evidence submitted by PMTC in reaching its ultimate decision.

105.     ACCSC's actions as alleged above resulted in a denial of due process to PMTC and the wrongful refusal to continue its accreditation, which now threatens PMTC's ability to serve its students and its very existence, all of which could result in PMTC experiencing damages in an amount of at least One Million and 00/100 Dollars ($1,000,000.00).

## COUNT II

### BREACH OF CONTRACT (Accreditation Manual)

106.    PMTC hereby restates and incorporates by reference each and every one of their

allegations set forth in paragraphs 1 through 105 of this Verified Complaint, as though fully set

forth herein.

107.    Both parties agreed to be bound by the ACCSC *Standards of Accreditation*, as a

formal contract, which governs both conduct by the school and conduct by ACCSC in its

accreditation reviews. **Exhibit B**, p. 9, § (D)(1).

108.    When PMTC applied to receive accreditation from ACCSC and ACCSC granted

it accreditation to PMTC in 2000 (which was later extended in 2006 for five years), PMTC and

ACCSC formed a valid contract (hereinafter the "Contract") .

109.    PMTC, as part of its contract with ACCSC as its accreditor, pays ACCSC annual

dues and other fees. PMTC materially complied with all of its obligations under the Contract.

110.    ACCSC's Contract with PMTC included an implied duty of good faith and fair

dealing.

111.    ACCSC materially breached the Contract by, among other things

a.      refusing to apply the *Standards of Accreditation*, as written, in deciding whether

to renew PMTC's accreditation;

b.      failing to enforce the "Code of Conduct" for on-site Team members; and

c.      relying on the flawed fact-finding of a Team Leader whose conduct ACCSC was

fully aware made him unqualified to conduct a Team site visit.

112.    As a direct and proximate result of these material breaches of the Contract, PMTC

has incurred damages and will continue to incur substantial damages including, among other

things, a loss of present and future Title IV Program Funding, damage to its reputation, loss of goodwill, a loss of students, and the potential loss of its entire business with monetary damages in the amount of at least One Million and 00/100 Dollars ($1,000,000.00).

## COUNT III

## NEGLIGENCE

### (in the alternative to Breach of Contract)

113.    PMTC hereby restates and incorporates by reference each and every one of their allegations set forth in paragraphs 1 through 112 of this Verified Complaint, as though fully set forth herein.

114.    PMTC placed its trust and confidence in ACCSC as its accrediting agency and depended on ACCSC to discharge its duties to provide fair and unbiased accreditation services, assessments and rulings to and about PMTC.

115.    ACCSC had and has a legal duty to fairly and properly consider PMTC's application for re-accreditation and to act with respect to show cause and probation orders in a fair and reasonable manner.

116.    ACCSC materially breached its duties when it employed Michael Ackerman of ATI as its Team Leader and when it ultimate relied on fact-finding made by Michael Ackerman in its final decision.

117.    ACCSC's withdrawal of PMTC's accreditation and the other acts set forth herein breached duties owed to PMTC, because ACCSC, in committing these actions, did not discharge its duty to provide fair and unbiased accreditation services to PMTC and was not fair and reasonable to PMTC.

118.    As a direct and proximate result of these breaches by ACCSC of its legal duties owed to PMTC, PMTC has incurred damages and will continue to incur substantial damages including, among other things, a loss of present and future Title IV Program Funding, damage to its reputation, loss of goodwill, a loss of students, and the potential loss of its entire business, with damages in the amount of at least One Million and 00/100 Dollars ($1,000,000.00).

**COUNT IV**

**TORTIOUS INTERFERENCE WITH CONTRACT**

**(Program Participation Agreement)**

119.    PMTC hereby restates and incorporates by reference each and every one of their allegations set forth in paragraphs 1 through 118 of this Verified Complaint, as though fully set forth herein.

120.    By granting accreditation to an educational institution, ACCSC enables that institution to enter a contract with the Department regarding the conditions of the institution's eligibility for Title IV Program Funding.

121.    This contractual agreement is entitled a "Program Participation Agreement" and sets forth the reciprocal rights and responsibilities of the school and the Department.

122.    ACCSC had actual knowledge of PMTC's eligibility for and participation in Title IV Program Funding and, consequently, had knowledge of PMTC's contract with the Department.

123.    The vast majority of students who enroll at PMTC must obtain grants and loans under the Title IV Programs to pay their tuition and living costs.

124.    ACCSC knew that PMTC's ability to receive Title IV Program Funding for current students is contingent upon it receiving and maintaining accreditation as recognized by the Department.

125.    In declining to renew PMTC's accreditation, ACCSC intended that PMTC become an formerly ACCSC accredited institution which would not be able to meet the Title IV institutional accreditation requirement, and in so doing, ACCSCS intentionally and knowingly prevented PMTC from performing under its contract with the Department.

126.    As a direct and proximate result of this intentional, willful and tortious interference with a contractual relationship between PMTC and the Department, of which ACCSC had knowledge, PMTC has incurred damages and will continue to incur substantial damages, including, among other things, a loss of current and future students with their concomitant tuition payments, a loss of present and future Title IV Program Funding, damage to its reputation, loss of goodwill, and the potential loss of its entire business, with damages as great as $1 Million or more.

**COUNT V**

**TORTIOUS INTERFERENCE WITH CONTRACT**

**(Student Enrollment Agreements)**

127.    PMTC hereby restates and incorporates by reference each and every one of their allegations set forth in paragraphs 1 through 126 of this Verified Complaint, as though fully set forth herein.

128.    By granting accreditation to an educational institution, ACCSC enables that institution to enter into contracts or other business relationships with students providing for their enrollment in accredited programs.

33

129.   PMTC has entered into an enrollment contract with each of its students. This contract sets forth the reciprocal rights and responsibilities of the school and each student, including the responsibility of students to pay tuition. PMTC's students entered into such enrollment contracts based, in part on the fact of PMTC's accreditation by an accrediting agency officially recognized by the U.S. Secretary of Education, namely, ACCSC, and the fact of PMTC's eligibility for and participation in the federal student aid programs.

130.   ACCSC had actual knowledge of PMTC's contracts with its students.

131.   ACCSC knew that PMTC's ability to maintain its relationships with students, and to meet their expectation that the institution would have access to federal student aid funds under the Title IV Programs throughout their period of enrollment, depended on PMTC maintaining its ACCSC accreditation.

132.   In wrongfully terminating PMTC's accreditation without any reasonable basis and in willfully and wrongfully failing to follow the ACCSC *Standards of Acccreditation*, ACCSC intended to affect PMTC's relationships with it students by essentially forcing them to either attend an unaccredited institution lacking federal student aid or to leave PMTC for another institution and ACCCS thereby intentionally and knowingly interfered with PMTC's contractual relationships with its students.

133.   ACCSC's intentional interference was without justification or excuse.

134.   As a direct and proximate result of this intentional, willful and tortious interference with contractual relationships, of which ACCSC had actual knowledge, PMTC has incurred damages and will continue to incur substantial damages, including, among other things, a loss of current and future students with their concomitant tuition payments, a loss of accreditation, damage to its reputation, loss of goodwill, and the potential loss of its entire

34

business, with damages in the amount of at least One Million and 00/100 Dollars ($1,000,000.00).

## COUNT VI

## TORTIOUS INTERFERENCE WITH PROSPECTIVE

## BUSINESS OR ECONOMIC ADVANTAGE

135.    PMTC hereby restates and incorporates by reference each and every one of their allegations set forth in paragraphs 1 through 134 of this Verified Complaint, as though fully set forth herein.

136.    PMTC has entered into an enrollment contract with each of its students. This contract sets forth the reciprocal rights and responsibilities of the school and each student, including the responsibility of students to pay tuition.

137.    ACCSC knew that PMTC and its students entered into such contracts.

138.    ACCSC's intentional and wrongful termination of PMTC's accreditation, without cause or due process, has caused or will cause current students to withdraw from PMTC.

139.    Without ACCSC's wrongful termination of PMTC's accreditation, PMTC's current students would continue to enjoy access to federal student aid and would continue to perform under their enrollment contracts, including making tuition payments to PMTC.

140.    ACCSC also knew that PMTC would, from time to time, attract new students, who, based on the School's accreditation and its eligibility for federal student aid, also would enter into enrollment contracts with the school and, pursuant to those contracts and awards of federal student aid, pay tuition to PMTC.

141.    In withdrawing accreditation from PMTC, ACCSC intended to prevent PMTC from offering prospective students the opportunity to enroll in an accredited massage therapy

institution. ACCSC's wrongful termination of PMTC's accreditation has caused and will cause future students not to enroll. Absent ACCSC's wrongful withdrawal of PMTC's accreditation, ACCSC's future students would enter into enrollment contracts and, pursuant to those contracts, pay tuition to PMTC.

142.    As a direct and proximate result of this willful and intentional interference with a contractual relationship of which ACCSC knew, PMTC has incurred damages and will continue to incur substantial damages, including, among other things, a loss of current and future students with their concomitant tuition payments, a loss of present and future Title IV Program Funding, damage to its reputation, loss of goodwill, and the potential loss of its entire business, with damages in the amount of at least One Million and 00/100 Dollars ($1,000,000.00).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, PMTC, prays the Court to enter judgment in its favor on its claims, providing relief as follows:

(1) entering a preliminary injunction requiring ACCSC, among other things, to rescind its decision to withdraw PMTC's accreditation and to reinstate its accreditation,  to immediately provide notice, of the withdrawal of the termination and reinstatement of accreditation, to the Department of Education and all other parties ACCSC has informed regarding PMTC's loss of accreditation, in all ways in which ACCSC has provided notice of the withdrawal of the accreditation including via correspondence and publication on the internet, and to maintain PMTC in accreditation pending the outcome of this litigation;

(2) entering a permanent injunction requiring ACCSC to follow all procedures set forth in the *Standards of Accreditation* and those required by the federal regulations and federal common law due process and to restore and extend PMTC's accreditation.

(3) awarding PMTC damages in the amounts set forth herein or as to be determined at trial, including compensatory and consequential damages as well as prejudgment and post-judgment interest;

(5) granting such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all claims for money damages and issues of fact that are so triable.

Dated: August 16, 2012

Respectfully submitted by:

Andrew Felice, VA Bar #26277
Maureen E. Carr   Va. Bar # 72802
Rees Broome, PC
8133 Leesburg Pike
Ninth Floor
Tysons Corner, VA 22182
703-790-1911
703-848-2530 (fax)
afelice@reesbroome.com

Mailing Address Effective 9-2-12:
1900 Gallows Road
Suite 700
Tysons Corner, VA 22182

And

Ronald L. Holt, MO Bar # 30160
Matthew L. Hoppock, KS Bar # 23854
Dunn & Davison, LLC
1100 Walnut Street, Suite 2900
Kansas City, MO  64106
Tel. (816) 292-7600
Fax (816) 292-7601
rholt@dunndavison.com
mhoppock@dunndavison.com

*Pro hac vice Motion pending*

**ATTORNEYS FOR PLAINTIFFS**

**VERIFICATION**

STATE OF MISSOURI     )
                               ) ss.
COUNTY OF GREENE     )

        I, Juliet Mee, state that I am the Director and owner of Professional Massage Training Center ("PMTC") the Plaintiff in this action, that I am authorized to make this verification on behalf of Plaintiff PMTC; that I have read the entire foregoing Verified Complaint and know the contents thereof; and that all allegations made therein with respect to Plaintiff PMTC are true and accurate to the best of my knowledge and belief.

        I declare under penalty of perjury that the foregoing is true and correct.

DATE: August *17*, 2012

_Juliet Mee_ (signature)
                                      Juliet Mee

        Subscribed and sworn to before me, a Notary Public within and for said County and State, on this *14th* day of August, 2012.

_____
                                      Notary Public

My Commission Expires:

*5/23/15*

C. PYKE
My Commission Expires
May 23, 2015
Greene County
Commission #11190966

**CERTIFICATE OF SERVICE**

I certify that on this ⟨16⟩ day of August, 2012, a true and accurate copy of the foregoing **VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** was served as follows:

By first class mail to:
        Accreditation Alliance of Career Schools and Colleges
        d/b/a The Accrediting Commission of Career Schools and Colleges
        2101 Wilson Boulevard, Suite 302
        Arlington, VA 22201

By courier to:
        Accreditation Alliance of Career Schools and Colleges
        d/b/a The Accrediting Commission of Career Schools and Colleges
        c/o CT Corporation System
        4701 Cox Road, Suite 301
        Glen Allen, VA 23060

By first class mail and email to:
        George G. Olsen, Esq.
        Williams & Jensen
        701 8th Street, NW
        Suite 500
        Washington, DC 20001
        GGOlsen@wms-jen.com

                                        Andrew Felice, VA Bar #26277
                                        Maureen E. Carr, VA Bar #72802
                                        Rees Broome, PC
                                        8133 Leesburg Pike
                                        Ninth Floor
                                        Tysons Corner, VA 22182
                                        703-790-1911
                                        703-848-2530 (fax)
                                        afelice@reesbroome.com
                                        mcarr@reesbroome.com

                                        *Mailing Address Effective 9/1/12*:
                                        1900 Gallows Road
                                        Suite 700
                                        Tysons Corner, VA 22182