**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

- Alexandria Division –

| | | |
|---|---|---|
| **PROFESSIONAL MASSAGE** | ) | |
| **TRAINING CENTER, INC.** | ) | |
| | ) | Case No. 1:12-cv-00911-LO-IDD |
| versus | ) | |
| | ) | Trial: July 15, 2013 |
| **ACCREDITATION ALLIANCE OF** | ) | |
| **CAREER SCHOOLS AND COLLEGES** | ) | |

# DEFENDANT ACCSC'S
# TRIAL BRIEF

# Table of Contents

I.   INTRODUCTION AND SUMMARY ............................................................ 1

II.  ACCSC'S TRIAL WITNESSES AND EXHIBITS .................................... 3

III. ACCSC AND THE *STANDARDS OF ACCREDITATION* ....................................... 4

   A.  ACCSC—a Private, Non-Governmental Accreditation Agency ............................... 4

   B.  ACCSC's *Standards of Accreditation* ........................................................ 4

   C.  The Connection Between Accreditation Agencies and the U.S. Department of Education's Title IV Program ............................................................................... 6

IV.  THE COMMISSION'S 12-0 DECISION TO DENY PROFESSIONAL MASSAGE'S APPLICATION FOR RENEWAL OF ACCREDITATION ....................... 7

   A.  ACCSC's Process Followed in Consideration of Professional Massage's Application ......................................................................................... 8

   B.  The Evidence Supporting the Commission's 12-0 Decision ................................. 9

      1.  The Management Team Revolving Door/Management Team Gutted ................. 10

      2.  The Five Steps that Placed the Facts Clearly Before the Commission ................. 14

V.   THE ACKERMAN CLAIMS AND STAFF BIAS ALLEGATIONS ......................... 19

   A.  The Facts on Michael Ackerman's Assignment to the Site Evaluation Team that Visited Professional Massage in August 2010 ............................................. 19

   B.  Tortious Interference Claims Under Missouri Law ............................................... 21

VI.  PROFESSIONAL MASSAGE'S DAMAGES CLAIMS ........................................ 21

   A.  The Claim for 38 Years of Actual Profits ............................................................ 21

   B.  Professional Massage Cut its Advertising by 90% Prior to Loss of Accreditation ... 23

   C.  Other Causes for the School's Financial Problems ............................................... 25

VII. CONCLUSIONS ................................................................................. 26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

- Alexandria Division –

| | |
|---|---|
| **PROFESSIONAL MASSAGE** ) | |
| **TRAINING CENTER, INC.** ) | |
| ) | Case No. 1:12-cv-00911-LO-IDD |
| versus ) | |
| ) | Trial: July 15, 2013 |
| **ACCREDITATION ALLIANCE OF** ) | |
| **CAREER SCHOOLS AND COLLEGES** ) | |

# DEFENDANT ACCSC'S TRIAL BRIEF

Defendant ACCSC files this Trial Brief in advance of the scheduled July 15th trial.

## I.  INTRODUCTION AND SUMMARY

This case arrived in this Court after a two-year process in which Professional Massage's Application for Renewal of Accreditation was considered by the ACCSC Commission and ultimately denied on a 12-0 vote in February, 2012.  The school pursued an appeal before an independent Appeals Panel.  In a decision reported on July 11, 2012, that Panel unanimously upheld the Commission's decision.

Unhappy with the outcome, Professional Massage filed this lawsuit in August 2012. Pursuant to the Higher Education Act, 20 USC § 1099b *et seq*., Federal Courts have exclusive jurisdiction to hear a case involving a denial of accreditation.  The Court's consideration of the denial, however, is not a *de novo* review, but instead is limited to whether the accreditation agency's decision was "arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence."  *Thomas M. Cooley Law School*, 459 F.3d 705, 712, *cert denied.* 549 U.S. 1116 (2007).

Moreover, this Court recognized in its September 17, 2012 Preliminary Injunction Order that determinations by the ACCSC Commissioners are due "great deference."  The Court wrote:

> In an action challenging an accreditation agency's revocation of accreditation, courts owe "great deference" to the agency's decision. This is because "[t]he standards of accreditation are not guides for the layman but for professionals in the field of education."

Order Granting P.I., p. 3, Sept. 17, 2012 (ECF No. 52) (internal citations omitted).

Professional Massage's burden at trial is to prove that the Commissioners' unanimous vote was "arbitrary and unreasonable or an abuse of discretion" while ceding that the Commissioners are due "great deference" in their determinations.

**FIGURE 1**



Trial Approached in Three Parts

The facts in this case are in three parts, as shown in FIGURE 1.  While one segment of the case focuses on the ACCSC record, there are multiple claims buried in the six counts of Plaintiff's First Amended Complaint.  The counts identify contract, tort, and tortious interference theories.  PMTC also asserts that it is owed substantial damages of approximately $1.4 million.

In this Trial Brief, ACCSC outlines its anticipated trial evidence.  ACCSC first introduces the witnesses who are likely to testify in the Defense Case.  ACCSC then identifies and describes itself and its *Standards of Accreditation,* the public document that recites ACCSC's procedures and states the substantive standards that all ACCSC-accredited schools must meet.  The evidence likely will include testimony about the design of post-secondary

accreditation and the connection between accreditation agencies such as ACCSC and the U.S.

Department of Education's Title IV program for student loans and grants.

The trial evidence then will track the case segments shown above in FIGURE 1—the

ACCSC Process and Commission Decision (Section IV), the Ackerman Claims and Tortious

Interference (Section V), and Professional Massage's Claimed Damages (Section IV).

## II.    ACCSC'S TRIAL WITNESSES AND EXHIBITS

ACCSC expects to call in its Defense Case the nine witnesses shown below:



**Dr. Karen Kershenstein**
Accreditation Expert



**Dr. Michale McComis**
ACCSC Executive Director



**Kristi Mollis**
Former ACCSC Commissioner



**Lisa Miles**
ACCSC Manager
of Accreditation



**Christopher Lambert**
ACCSC Associate
Executive Director



**Sean Forman**
ACCSC Senior
Accreditation Analyst



**Bettina Falwell**
ACCSC Manager of
Accreditation Operations



**Courtney Moraites**
Senior Accreditation
Coordinator



**Harold Martin, CPA**
Damages Expert

ACCSC also expect to offer in evidence the 164 previously-identified trial exhibits and expects to submit portions of deposition testimony from 7 or 8 witnesses who are more than 100 miles away from the court pursuant to Fed. R. Civ. P. 32(a)(4)(B).  Further, ACCSC will present part of its defense case through the cross-examination of Professional Massage's witnesses, through the use of Juliet Mee's individual depostion trancript, and through the transactipts from the Fed. R. Civ. P. 30(b)(6) depostions of Profesisonal Massage, which may be used "for any purpose" pursuant to Fed. R. Civ. P. 32(a)(3).

### III.   ACCSC AND THE *STANDARDS OF ACCREDITATION*

#### A.  ACCSC—a Private, Non-Governmental Accreditation Agency

ACCSC, a non-profit, non-stock Virginia corporation, accredits more than 750 career schools and colleges of varying sizes across the United States.   As an accreditation agency it is a private entity, not a governmental agency.

 ACCSC has a 13-member Commission:  nine of the 13 Commissioners are elected by the ACCSC-member schools and four are appointed as public members.  All ACCSC's School Action decisions are made by the ACCSC Commissioners.  ACCSC's staff of 32-34 individuals support the Commissioners in their work.  Dr. Michale McComis serves as the Executive Director.  ACCSC's headquarters is in Arlington, Virginia.

#### B.  ACCSC's *Standards of Accreditation*

ACCSC's Rules of Procedure and its Substantive Standards are stated in its *Standards of Accreditation,* a 112-page volume.  *See* Def.'s Ex. 1 (*Standards of Accreditation*).   The *Standards* confirm in the Introduction that "[p]articipation in the process of accreditation is voluntary on the part of the school."   The Introduction continues, "[b]y applying for and receiving accreditation, a school accepts the obligation to demonstrate compliance with the

*Standards of Accreditation."*  And, "[b]y applying for and receiving accreditation, a school accepts the obligation to demonstrate compliance with the *Standards of Accreditation."*  Finally, by applying for accreditation with ACCSC, a school affirms that it has read and understands the *Standards of Accreditation*.

Chapter 1 of the *Standards* contains the Rules of Process and Procedure while Chapter 2 includes the Substantive Standards.   As shown below in FIGURE 2, the Management Standards are mandatory requirements for all schools seeking ACCSC accreditation.

## FIGURE 2



1. **The school must have adequate management and administrative capacity in place that includes:**

ACCSC
STANDARDS OF ACCREDITATION

CHAPTER 2
SUBSTANTIVE STANDARDS

A.  **Management and Administrative Capacity**

1.  The school must have adequate management and administrative capacity in place that includes:

   a.  Full-time on-site supervision by an individual or team with the appropriate combination of education, experience, and demonstrated ability to lead and manage a post-secondary educational institution;

   b.  Owners, members of school management, and administrative employees who are qualified for their particular roles and who possess the appropriate education, training, and experience commensurate with the level of their responsibilities;

   c.  A sufficient number of managers and administrative employees necessary to support the school's operations, student services, and educational programs; and

   d.  Appropriate administrative and operational policies and procedures to which the school adheres and reviews and updates as needed.

2.  All owners, members of school management, and administrative employees must have past records of integrity that would ensure compliance with accrediting standards and applicable federal, state, and local requirements. The Commission will consider an individual's affiliation with a school that has lost or been denied accreditation, entered into bankruptcy, or closed; as well as an individual's involvement in criminal proceedings and any pending or past action in a court or administrative body.

3.  Members of school management and administrative employees must participate in ongoing development and training activities that support their particular roles in the school.

4.  The continuity of management and administrative capacity is ensured through the reasonable retention of management and administrative staff.

4.  **The continuity of management and administrative capacity is ensured through the reasonable retention of management and administrative staff.**

A school must comply with *every* standard, and in that sense, they are all mandatory.  A school's failure to comply with one particular standard cannot be balanced against the school's compliance–or even superior performance–under a different standard.  Regardless of how well a school may perform in other areas, a school must comply with the Management Standards.

Failure to comply with this standard means that a school will not be accredited.  It is that simple.[1]

These mandatory standards are central in the case.  In its March 7, 2012 Denial Letter (Def.'s Trial Ex. 57), ACCSC cited two grounds tied to these standards as bases for the Commission's denial of Professional Massage's Application.

### C. The Connection Between Accreditation Agencies and the U.S. Department of Education's Title IV Program

As noted above, accreditation is a voluntary undertaking.  Indeed, post-secondary schools may operate in most states without accreditation.  In Missouri—the home state to Professional Massage—licensure by the Missouri Department of Higher Education is sufficient for an unaccredited school to operate within the state.   Professional Massage confirms that it was well aware of this option in Juliet Mee's "Missouri Letter" (July 20, 2012 letter to Leroy Wade at the Missouri Department of Higher Education) (Def.'s Trial Ex. 138).

The U.S. Department of Education sets accreditation as one of its requirements for Title IV eligibility.  Title IV is the short-hand name for the Department of Education's program for administering federal student loans and grants.   Under this program, students may seek federal

---

[1] The *Standards of Accreditation* include a provision under which a school may apply for a waiver of one or more standards.  The waiver process is not automatic, it involves a written application, and a school must justify the waiver.  The Commission then decides whether to grant the waiver.  In this case, it is undisputed that Professional Massage never sought a waiver from the Commission.  Therefore, the school had to demonstrate its compliance with all the *Standards*.  And because Professional Massage never sought a waiver from the Commission, this Court should not consider any argument that Professional Massage did not need to comply with each *Standard*.  *See, e.g.*, *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994) ("As a general matter, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved.").

grants and loans if the post-secondary school they attend is certified eligible by the Department of Education.

For this, the school's accreditation must be from an accreditation agency recognized by the Secretary of Education.   An agency petitions the Department of Education for recognition. The Higher Education Act and the Department's regulations establish the process and requirements for recognition.

ACCSC has been continuously recognized by the Secretary of Education as a national accrediting agency since 1967.  In 2011, ACCSC petitioned for renewal of its recognition status. After a comprehensive review by the Department of Education, the Secretary renewed ACCSC's status for the maximum-permitted five years.  In practical terms, ACCSC's recognition by the Secretary of Education as a national accrediting agency means that ACCSC's procedures and substantive standards satisfy the statutory and regulatory requirements, including the due process requirements in the regulations.

## IV.    THE COMMISSION'S 12-0 DECISION TO DENY PROFESSIONAL MASSAGE'S APPLICATION FOR RENEWAL OF ACCREDITATION

To prevail at trial on its Count 1, Professional Massage must prove that the Commission's 12-0 decision to deny the school's Application was "arbitrary and unreasonable or an abuse of discretion" and that the decision was not "based on substantial evidence." *Thomas M. Cooley Law School v. Am. Bar Ass'n*, 459 F.3d 705, 712-13 (6th Cir. 2006).

The trial evidence will show first that ACCSC followed its procedures from its *Standards of Accreditation,* and second, that there is substantial evidence supporting the decision.  Of course, the burden at trial is always on the Plaintiff, which is to say that Professional Massage

must prove that ACCSC's procedures were not followed and that the record does not include sufficient evidence supporting the decision.

### A.  ACCSC's Process Followed in Consideration of Professional Massage's Application

The consideration of Professional Massage's Application began in January 2010 when the school filed the Application, and ended in July 2012 when an Independent Appeals Panel affirmed the Commission's 12-0 decision denying the Application.  The events along the way are shown in FIGURE 3, a timeline that begins with the Application filing and identifies the Site Visits, ACCSC Team Summary Reports, the school's Responses, and Commission Action.

### FIGURE 3



ACCSC trial testimony will refer from time to time to this Timeline.

### B.  The Evidence Supporting the Commission's 12-0 Decision

In its March 7, 2012 Denial Letter (Def.'s Trial Ex. 57), ACCSC cited two primary

grounds for the Commission's denial of the Application:

(1)  The Commission determined that PMTC failed to demonstrate that the school
ensures the continuity of management and administrative capacity through the
reasonable retention of management and administrative staff *(Section I (A)(4),
Substantive Standards, Standards of Accreditation).*

(2)  The Commission determined that PMTC failed to demonstrate that it
maintains full-time on-site supervision by an individual or team that has the
demonstrated ability to lead and manage the institution *(Section I (A)(1),
Substantive Standards, Standards of Accreditation).*

These two issues were reoccurring problems at Professional Massage going back many

years.  The record is lengthy, but there are five steps that explain in significant part the action.

ACCSC employs FIGURE 4 below to guide the tracking of the evidence.

### FIGURE 4



The discussion starts with the facts cited in FIGURE 4, and then will move to the five steps.

### 1.  The Management Team Revolving Door/Management Team Gutted

Prior to the loss of Accreditation in 2012, Professional Massage had a recent history of non-compliance with the *Standards*, leading to two recent Probation Orders.  The first probation occurred in December 2010 in light of the school's failures to comply with multiple *Standards* in the school's initial compliance submission to ACCSC (known as the "Self-Evaluation Report" or "SER") and the First Team Site Visit, including the two *Standards* mentioned above.[2]

Faced with Commission's December 2010 Probation Order (Def.'s Trial Ex. 37) and advice from its own consultant that the school needed a separate Administrator to assist the Owner, PMTC first recruited April Durnell, a post-secondary school compliance professional with 24 years of experience as a School Administrator.  The school highlighted Ms. Durnell in its written Response to the Probation Order, and introduced her to ACCSC at the Directed Site Visit in June 2011.

Professional Massage subsequently recruited Rebecca Cox to serve as the School Director in response to the December 2010 Probation Order.  Ms. Cox possessed extensive experience with 14 years as the Executive Director of two post-secondary schools and 20 years in school management in total.  While she had been recruited by Professional Massage at the

---

[2] At this point, the Commission had the authority to terminate PMTC's accreditation then and there.  The Commission, however, listened to PMTC's promises that it would achieve compliance and exercised discretion to give the school another chance to demonstrate compliance.  ACCSC staff frequently consulted with Ms. Mee in an effort to guide the school back into compliance.  At first, the results looked promising, especially considering the new hires touted by the school later in 2011.  But those initial hopes soon evaporated as Ms. Mee fired the very people she touted to the Commission.

time of the second on-site visit by the ACCSC team on June 23, 2011, Ms. Cox had not yet started work at the school. Her start date is documented as June 27, 2011.

After the second Commission-directed Site Visit, the team produced its "Team Summary Report," which summarized the team's findings (Def.'s Trial Ex. 52).[3] This Report was shared with Professional Massage on August 25, 2011, and per the *Standards*, the school was required to provide a response to the Report if it wanted to prove compliance and maintain its accreditation. Professional Massage responded to the Second Team Summary Report on October 8, 2011 (Def.'s Trial Ex. 53). The school's Response included Rebecca Cox's resume and Job Description, and highlighted her as an important part of the school's Management Team, along with Ms. Durnell.

Ms. Cox and Ms. Durnell did not last long at Professional Massage. Juliet Mee fired Rebecca Cox on December 2, 2011. A few days later, Ms. Mee fired April Durnell.

The broader consequence of the Cox/Durnell firings was that the Management Team that Professional Massage touted to ACCSC in June 2011, and again in October 2011, was gutted. The school's Management Team was further hit by additional departures: Jessica Bell, the school's Director of Finance, resigned in July, 2011; her replacement, Jeremiah Mee (Juliet Mee's brother), stayed only a few months and was gone by January 2012. At that point, the school had no Director of Finance, which remains true to this day.

---

[3] This second site visit was specifically focused on management and directed by the Commission based on its continuing concerns about PMTC's management.

**FIGURE 5**

**PMTC Management Team—June 2011 versus Dec 2011**



The most damaging departures were clearly those of Ms. Cox and Ms. Durnell.  They were the star hires–two seasoned school managers with 14 and 24 years, respectively, of experience in their positions.  Professional Massage held these two out to ACCSC as the answer to the school's management and compliance problems in an effort to continue accreditation.  But within a few short months, both had been fired.  They were replaced with three individuals with limited school management experience, and with the arguably most qualified person, Jeremiah Mee, already on his way out the door of the school.

Management departures, either by resignation but more often by firings, were an unfortunate but regular event at Professional Massage.  The trial evidence will show that at the time of the June 2011 Second Site Visit, the school had gone through three school administrators in nine months.  At one meeting in mid-2010, Juliet Mee apparently fired the entire faculty and staff.  Throughout 2011, other managers left the school.  The overall tally shows that 2011 was an extremely volatile year for the staff /faculty at Professional Massage.  There were 21 departures—10 resignations and 11 firings during the year.  Given the staff size, this represents

85-95% turnover in just one year!  FIGURE 6 below identifies the top-level firings at the school

in 2010-11.

**FIGURE 6**

**PMTC 2010 and 2011 Management Teams – Resignations and Firings**



| | |
|---|---|
| **Entire PMTC Staff/Faculty**<br>**Fired** by Juliet Mee in June 2010 Meeting | **Rebecca Cox**<br>School Administrator<br><br>Hired: June 2011<br>**Fired**: December 2011<br>5 months |
| **Veronica Moody**<br>School Administrator<br><br>Hired: December 2010<br>**Fired**: January 2011<br>30 days | |
| **Susan Hoescht**<br>School Administrator<br><br>Hired: May 2010<br>**Fired**: June 2010<br>30 days | **April Durnell**<br>School Administrator<br><br>Hired: March 2011<br>**Fired**: December 2011<br>8 months |

**Becky Cox – 14 years as a School Executive Director**

A.  "Ms. Mee told me that she hired me because she need to hire someone with my credentials to be able to run the school, to be able to become accredited . . .
Q.  Did Ms. Mee give you the opportunity to serve as the director of the school?
A.  No, she did not.

R. Cox Deposition Mar 13, 2013 TR at 49-50

**April Durnell – 24 years in School Administration before PMTC**

"My time at PMTC has been very difficult, and Juliet [Mee] is less than willing to utilize my experience." . . . [Juliet Mee] has to be in control of everything, and if not she terminates whatever is standing in her way.  I have to accept that I just can't help those that don't want to change."

A. Durnell Dec 9, 2011 Email to  Lisa  Miles

| 2010 | 2011 |
|---|---|

When the Commission considered Professional Massage's Application at its February

2012 meeting San Diego, the school's new Management Team (the fourth plan submitted to

ACCSC during the Application consideration process) included Juliet Mee, her brother, Jeremiah

Mee, and two replacement employees—Jeremy Beatty and Linda Mayhugh—promoted from

within the school.  There was already an unrebutted finding that Ms. Mee was not qualified to

manage the school by herself.  The Commissioners first noted that PMTC admitted that Jeremiah

Mee was planning to leave the school, and then the Commission examined the Beatty and

Mayhugh resumes.  The Commission determined not only that neither replacement employees

had any appreciable post-secondary school compliance experience, but that they did even meet

the bare-bones experience requirements that Professional Massage *itself* set forth in the job

descriptions.

### 2.   The Five Steps that Placed the Facts Clearly Before the Commission

In a series of Team Reports, School Responses and Commission Actions, the facts

described above were recorded in the ACCSC record.

(1)      *The First Team Summary Report and the School's Response.* ACCSC's First

Site Visit to Professional Massage occurred in August 2010.  After the two-day visit, an Exit

Interview was held between the team and the staff of the school.  During this interview, the

ACCSC lead representative on the evaluation team, Courtney Moraites, advised Professional

Massage that there were 13 areas where the school failed to demonstrate compliance with the

*Standards of Accreditation*.  These areas were then repeated in a written Team Summary Report

prepared by the team and shared with Professional Massage (Def.'s Trial Ex. 33).  This Team

Summary Report repeated the 13 findings of noncompliance.  Finding #3 was that:

> *The school did not demonstrate adequate management capability, sufficient
> administrative capacity*, and planning for future improvement that will ensure the
> school will operate in compliance with accrediting standards, meet objectives, and
> fulfill its obligations to students (Section I, Statement of Purpose, Standards of
> Accreditation). The team came to this conclusion after consideration of the
> number and severity of the findings enumerated in this report, in context of the
> school's history of non-compliance, and the notice from the Department that the
> school has been placed on Heightened Cash Monitoring due to lack of proper
> administration of the Title IV Funding programs.

*Id.* at page 6 of 9 (emphasis added).

Professional Massage then had the opportunity to respond to the Team Summary Report.

In a response in October 2010, Professional Massage candidly acknowledged and conceded that

it had failed to demonstrate compliance with many of the *Standards of Accreditation*:

> We agree that Professional Massage Training Center, Inc. failed to demonstrate to
> the ACCSC On-Site Team that we were in compliance with the Standards of
> Accreditation in many areas as noted in the Team Summary Report.

PMTC's Response to Team Summary Report (Oct. 11, 2010) (Def. Trial Ex. 34).  The Response

then admits that certain information "was not shared with the onsite team, due to the

management's view that the issues were inflammatory and dramatic."  *Id.*  Then the school

makes a plea that it "put[s] our hopes in the compassion of the members of the commission."  *Id.*

The ACCSC Commission voted in November 2010 to place Professional Massage on

probation.  *See* ACCSC Probation Letter to PMTC, Dec. 8, 2010 (Def.'s Trial Ex. 37).  Not long

afterwards, Professional Massage recruited April Durnell and Rebecca Cox to join the school.  In

fact, the school's Response to the Probation Order (Def.'s Trial Ex. 42), highlighted Ms.

Durnell's resume and a new organizational chart that identified her as the "School

Administrator."

As a part of the Commission's effort to give Professional Massage another chance to

demonstrate compliance, a second Team Site Visit focusing on management was ordered for

June, 2011.

(2)    ***Second Team Summary Report Finding:  Another New Management Plan.***

ACCSC's Second Team Summary Report followed the Second Team Site Visit where

Professional Massage introduced and touted April Durnell.  The Second Team Summary Report

(Def.'s Trial Ex. 52), which under the *Standards of Accreditation* may be basis for the

Commission's ultimate decision, includes four detailed Findings stating the school's specific

failures to comply with the *Standards*.  The critical Finding #1, a statement of the central facts in

this case, begins with "PMTC did not demonstrate that the school has adequate management in

place as follows:"

a.      The school has yet to demonstrate full-time on-site supervision by an individual or team that has the demonstrated ability to lead the institution (Section I (A)(1), Substantive Standards, Standards of Accreditation). Although the school was able to demonstrate the addition of components to improve the administrative capacity of the school, the anticipated transition to a new school director has not yet taken place and therefore, the resulting management structure has yet to be fully developed. In addition, although the school has made strides towards organization and demonstration of compliance with accrediting standards, that process is still underway. As a result, the school is unable to make a definitive demonstration that the structure of the management team is adequate. Despite Ms. Mee's credentials in the area of massage therapy, a review of the compliance history of PMTC does not clearly demonstrate her ability to lead and manage a postsecondary educational institution in compliance with accrediting standards. *With the addition of April Durnell, and the anticipated addition of Rebecca Cox, Ms. Mee appears to have added strong experience to the management team; however, this team has not had the opportunity to demonstrate an ability to lead and manage the institution in compliance with accrediting standards.*

*Id.* at page 17 of 22 (emphasis added).  Note again in this Finding the facts relating to Juliet Mee: "a review of the compliance history of PMTC does not clearly demonstrate [Juliet Mee's] ability to lead and manage a postsecondary educational institution in compliance with accrediting standards."

The painful history of Professional Massage's compliance failings with both ACCSC and the U.S. Department of Education was already documented in the record, specifically the Department's placing the school on "Heightened Cash Monitoring Level 1" status, and then later, "Heightened Cash Monitoring Level 2" status for violations in managing Title IV funds.

In addition to the compliance failings, financial problems continued to plague the school in 2010 and 2011.  The Audit Reports that the school had to file annually showed the school's deteriorating financial condition.  *See* Def.'s Trial Exhibits 136 and 137.

The Findings in the Second Team Summary Report then spotlight the lack of continuity in the school's management and administration.

> d. The school has not demonstrated that it ensures continuity of management and administrative capacity through the reasonable retention of management and administrative staff (Section I (A)(4), Substantive Standards, Standards of Accreditation). *The school has had three Administrators in the previous nine months.* The school has added three new staff positions in the last six months and is anticipating the arrival of a new school director within days of the on-site evaluation. *Although Ms. Mee has remained a constant influence as the school's director, it would appear that the shifting management structures have had a negative impact on the operation of the school.*

Second Team Summary Report (Def.'s Trial Ex. 52) at page 18 of 22 (emphasis added).

(3) ***The School's Response to the Second Team Summary Report: No Challenge to the Finding that Juliet Mee is Not Qualified to Run the School by Herself.*** During each review by ACCSC of Professional Massage's performance, ACCSC cited management and administrative shortcomings, and this was no different in the Second Team Summary Report. Certainly, Juliet Mee as the sole leader of the school was not the solution for Professional Massage, and the school seemed to recognized this in its October 2011 Response to the Second Team Summary Report (Def.'s Trial Ex. 53). Professional Massage did not challenge or rebut the inherent conclusion that Ms. Mee was not qualified to run the school on her own. In fact, the school went the opposite direction, apparently guided by its consultant, and placed its bet entirely on the new Management Team built around April Durnell and Rebecca Cox, two individuals with deep experience in education accreditation compliance.

Professional Massage highlighted the arrival of Ms. Durnell and Ms. Cox in its October, 2011 Response to the Second Team Summary Report, and particularly lauded Ms. Cox's immediate assumption of responsibilities as School Director, noting that Ms. Mee would limit

her role in the management of the school.  Her resume with years of accreditation compliance experience was placed front and center in the school's Response.

(4)     ***The Departures of April Durnell and Rebecca Cox.***  The details surrounding the firings of Ms. Durnell and Ms. Cox are extensively described above in this Trial Brief, and there is no need for repetition on that point.  ACCSC also notes that in this litigation, Professional Massage has disputed the facts surrounding the termination of Ms. Cox and Ms. Durnell, claiming that they were terminated for cause.  While the evidence contradicts the school's assertion on this point, in the larger picture, it does not matter whether Ms. Cox and Ms. Durnell were fired or resigned.  What matters is that these two experienced individuals, highly-lauded by Professional Massage only months earlier, were suddenly gone.  Professional Massage had to disclose these developments when it responded to the December 2011 Probation Order.

At the same time as the Cox/Durnell drama was unfolding at the school, the ACCSC Commission met in November 2011 and considered the Second Team Summary Report and Professional Massage's Response.  While recognizing that the prospects for the school looked better with the addition of Ms. Cox and Ms. Durnell, the Commission still noted that the school had yet to demonstrate compliance.  As such, the Commission issued another Probation Order to Professional Massage, which arrived at the school just days after Ms. Cox and Ms. Durnell were fired by Juliet Mee.  *See* ACCSC Probation Order to PMTC, Dec. 7, 2011 (Def.'s Trial Ex. 54).

(5)     ***Professional Massage's Response to December 2011 Probation Order.***  In response to the 2011 Probation Order, PMTC submitted a lengthy written response (Def.'s Trial Ex. 55) which presented an entirely new management structure, in the wake of the firings of April Durnell and Rebecca Cox.  Complete with brand new organizational charts, this was a third revised organizational plan seen by the ACCSC Commission in 18 months.

To make matters worse, the replacements for Ms. Cox and Ms. Durnell came nowhere close to having the same deep educational accreditation experience. Further, the Commission concluded that the replacements did not even meet the job description criteria *developed by the school itself*.

In light of this history, and Professional Massage's inability to maintain a coherent management structure for longer than six-months, it is certainly understandable and reasonable that the Commission voted to deny the school's Application. It is certainly within the realm of reason to conclude that a school that presents a new management team every few months has failed to demonstrate management continuity. As such, the Commission issued its decision to deny Professional Massage's Application for Renewal of Accreditation in March, 2012 (Def.'s Trial Ex. 57).

## V.     THE ACKERMAN CLAIMS AND STAFF BIAS ALLEGATIONS

### A.  The Facts on Michael Ackerman's Assignment to the Site Evaluation Team that Visited Professional Massage in August 2010

The Ackerman Claims dominate Counts 2 and 3 of the First Amended Complaint. The facts as will be shown at trial do not support the counts. The evidence will show that Michael Ackerman volunteered to serve on ACCSC site evaluation teams. He testified that he had served on evaluation teams 30-40 times before his assignment to the August 2010 Professional Massage site visit. He is not and never was an ACCSC employee. At the time of the assignment to the Professional Massage Site Visit—roughly a month before the visit—there was absolutely no reason why ACCSC should have turned down Mr. Ackerman's volunteer service. While Professional Massage does not explicitly say so, its argument seems to be that ACCSC should have removed Mr. Ackerman from the visiting team after the assignment and prior to the Site

Visit because ATI Enterprises, Inc., Mr. Ackerman's employer, was mentioned in Senate hearings only days before the Site Visit.

A fundamental failing of Professional Massage's argument is that the only admissible evidence on this point is that Mr. Ackerman was *not*, as Professional Massage alleges, the Director of ATI's Campus 50, the site that was apparently referred to in the Senate hearings.  Mr. Ackerman's deposition testimony plainly states this fact.  The school would point to a newspaper article in July 2011, nearly a year after the Site Visit, for contrary evidence.  But this newspaper article is rank hearsay and cannot be considered by this Court at summary judgment.[4]  *Gantt v. Whitaker*, 57 Fed. Appx. 141, 150 (4th Cir. 2003) ("newspaper articles [used in summary judgment] are inadmissible hearsay to the extent that they are introduced to 'to prove the factual matters asserted therein.'").

There is no absolute duty that would require ACCSC to remove Mr. Ackerman. Professional Massage must show that ACCSC had knowledge before the Site Visit of some disqualifying wrongdoing on the part of Michael Ackerman, and then unreasonably refused to remove Ackerman.  The problem for Professional Massages' claims is that there is no evidence that confirms that as of August 9, 2011 ACCSC had *any* credible information that linked Michael Ackerman to any wrongdoing that would disqualify him from serving as an evaluation team member as he had many times before.  Professional Massage simply cannot point to anything known to ACCSC in early August 2010 those hearings that labels Mr. Ackerman as unfit.

---

[4] PMTC could have questioned Mr. Ackerman during his deposition about his relationship to Campus 50, but did not.

### B. Tortious Interference Claims Under Missouri Law

Counts 4, 5 and 6 have a series of fatal problems, but the issue common to all three counts is the element of "absence of justification." ACCSC's business is, in part, making accreditation decisions, and by filing its Application, Professional Massage essentially asked ACCSC to decide the accreditation decision. ACCSC's involvement is plainly justified.

Professional Massage's seems to argue that ACCSC cannot invoke the "defense of 'justification.'" The Missouri Supreme Court has a different view--the "absence of justification" is an *element* of the tort. *See, e.g.*, *Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 250 (Mo. 2006); *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 (Mo. 1993). As an *element* of the tort, "[t]he plaintiff carries the burden of affirmatively showing lack of justification." *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. banc 2006) (*citing Nazeri*, 860 S.W.2d at 316-17).

And, under Missouri law that proof must be by *substantial* evidence. "For a claim to be submissible, plaintiff must introduce substantial evidence of every element of the claim [of tortious interference with contract]. A mere scintilla of evidence is insufficient. Whether evidence is substantial is a question of law." *Beelman River Terminals, Inc. v. Mercantile Bank, N.A.*, 880 S.W.2d 903, 907 (Mo. Ct. App. 1994) (internal citations omitted). Thus, Professional Massage must "adduce substantial evidence on the element of absence of justification." *Stehno*, 186 S.W.3d at 252.

### VI.    PROFESSIONAL MASSAGE'S DAMAGES CLAIMS

### A. The Claim for 38 Years of Actual Profits

Professional Massage claims approximately $1.5 million damages in lost profits even though the school was only without accreditation for 9½ weeks, from July to September, 2012.

This lost profits claim equates to 38 years' worth of annual profit, using the school's actual historical profit numbers.  Professional Massage's damages claims are simply not credible.

The school's past financial and profit history is instructive here, and it is summarized in the top-half of the chart below at FIGURE 7.  Looking at the school's past five years' of federal tax returns, the school's average annual profit is $36,758, while annual revenue averaged $1.37 million.  The average annual pre-tax profits were just 3% of revenue.   Assuming that the school averages an enrollment of 88.4 students (which is the average student enrollment from 2007 through 20011), the per-student profitability is $416 (highlighted in red in FIGURE 7).

### FIGURE 7

| PMTC Actual Financial Performance 2007 - 2011 |
| Year | Revenue (1) | Enrolled Students (2) | Pre-Tax Profits (1) | Profit Rate (%) | Average Pre-Tax Profits Per Student |
|---|---|---|---|---|---|
| 2007 | $1,061,074 | 98 | $155,313 | 15% | |
| 2008 | 1,178,746 | 67 | 112,519 | 10% | |
| 2009 | 1,499,634 | 94 | 61,585 | 4% | |
| 2010 | 1,359,512 | 89 | (221,751) | -16% | |
| 2011 | 1,768,056 | 94 | 76,125 | 4% | |
| Total | $6,867,022 | 442 | $183,791 | 3% | |
| Average | $1,373,404 | 88.4 | $36,758 | 3% | $416 |
| | | | | | |

| Trugman Projected Lost Profits 2012 - 2015 |
| Year | Lost Revenues (3) | Lost Students (4) | Lost Profits (3) | Profit Rate (%) | Average Lost Profits Per Student |
|---|---|---|---|---|---|
| 2012 | $501,043 | 28 | $450,662 | 90% | |
| 2013 | 568,182 | 32 | 515,059 | 91% | |
| 2014 | 371,899 | 21 | 356,710 | 96% | |
| 2015 | 175,615 | 10 | 168,443 | 96% | |
| Total | $1,616,739 | 91 | $1,490,874 | 92% | |
| Average | $404,185 | 22.8 | $372,719 | 93% | $16,383 |
| | | | | | |

Notes:

(1) PMTC Federal Income Tax Returns
(2) Trugman Expert Report, p. 7
(3) Trugman Expert Report, p. 12
(4) Trugman Expert Report, p. 6

In contrast, the bottom-half of FIGURE 7 sets forth the lost profits calculation of Professional Massage's damages witness, Gary Trugman.  Mr. Trugman's projected lost revenue, lost profits, and average profit per student are not even in the same ballpark as Professional Massage's historical averages.

Mr. Trugman's lost profits projections results in an average per-student lost profit of $16,383 (also highlighted in red).  But when compared to PMTC's *historical* average profit per student ($416), we find that Mr. Trugman's projection is inflated 4,000% above the average historical per student profit.  Further, while Professional Massage's historical profit rate has been 3%, Mr. Trugman's calculations result in a projected average profit rate of 93% for the supposed students lost in 2012 through 2015.

### B. Professional Massage Slashed its Advertising by 90% Prior to the Loss of Accreditation.

When Professional Massage drastically cut is advertising and marketing expenditures in mid-2011, the school stopped advertising on radio and television.  As a result, contacts with prospective students declined sharply, and ultimately student enrollment at the school shriveled.

This cut in advertising spending was a dramatic turnabout from 2009, when Juliet Mee determined that the school's target advertising spending would be 14%.  Indeed, to attract prospective students to contact the school, an ongoing marketing program was declared essential by the school and highlighted in the school's submissions to ACCSC.  *See* PMTC's Self Evaluation Report (July 7, 2010) (Def.'s Trial Ex. 31).  PMTC even went as far as to hire a full-time marketing director, Bryan Fisher.

PMTC reversed course on advertising in September 2011 when the school's coffers were nearly empty.  At this point, Juliet Mee turned off the advertising/marketing spending.  By January 2012 (seven months prior to the suspension of ACCSC accreditation in July, 2012), the advertising spending was off 90% from earlier levels.  Since late 2011 (again, prior to the loss of accreditation), Professional Massage has done zero radio and television advertising.

**FIGURE 8**

The consequence was predictable.  First, that the number of prospective student contacts quickly diminished, and then the number of student enrollments dropped as well.  As an example, the table in FIGURE 8 compares Professional Massage's data for 2Q 2011 versus 2Q 2012.  The table shows a drop from 184 contacts to 88 contacts—a 52% decline.

**PMTC Prospective Student Contacts**
2011 (2nd Qtr) vs. 2012 (2nd Qtr)

|  | 2011 | 2012 |
|---|---|---|
| April | 54 | 34 |
| May | 59 | 26 |
| June | 71 | 28 |
| **Totals** | **184** | **88** |

The decline in student enrollments also tracks the decline in student contacts and decline in advertising spending.  Depicted below in FIGURE 9 is a chart comparing advertising spending (in red) and student enrollment (in green).  As is readily seen, the school started to cut advertising spending in 2010, which then declines to nearly zero by the middle of 2012.  With an

**FIGURE 9**



understandable lag, student enrollment begins to drop in 2011 and declines throughout 2012.

Despite this obvious explanation for declining enrollment prior to the loss of accreditation, Mr. Trugman did not even consider the impact of advertising spending in his Initial Report served in February 2013.

### C.  Other Causes for the School's Financial Problems

In an extraordinary letter sent in July 2011 to Professional Massage's vendors, Juliet Mee projected that the school's dire problems followed from "a coordinated effort" which was "timed to inflict the greatest harm to [the school]."   Def.'s Trial Ex. 93.  She blamed the school's misfortunes on the U.S Department of Education, the Missouri Coordinating Board for Higher Education, the Missouri Department of Revenue, the school's local bank, and ACCSC.  *Id.*  Ms. Mee wrote:

> From the announcement of our first program review on December 23, 2009, at 2:30 in the afternoon there were major actions that we had to contend with on a regular basis. As ridiculous as it sounds, all of the major actions were timed to inflict the greatest harm to our organization. While it was happening, it looked like a horrible coincidence. In hindsight it was a coordinated effort.  When the Department of Education began to investigate us, our accrediting board (ACCSC), the Missouri Coordinating Board for Higher Education, the Missouri Department of Revenue as well as our bank began their own separate investigations and audits of us.

*Id*.  What Juliet Mee did not explain to the school's vendors in her letter is that the referenced investigation by ACCSC was the process initiated in January 2010 when Professional Massage submitted its Application for Renewal of Accreditation.

Ms. Mee continues in her Vendor Letter blaming primarily "the governmental agencies," seemingly identifying the Department of Education and the two Missouri state agencies.  She accuses them and observes, "Sovereign immunity allows them to do things and to act in a way that no other entity could ever even consider."  Then she acknowledges the school's troubles:

> Ultimately, I feel that it is amazing that we have been able to stay alive as a company. This type of action(s) not only consumed large amounts of cash during a difficult financial situation for everyone, it made it so we could not pursue sales or follow through on opportunities. I do imagine that potentially some of you are saying, "I know how you survived. You didn't pay our bills and you passed on your troubles to us." Although painful to admit, this is a fair statement.

*Id*. Given Ms. Mee's insistence of "a coordinated effort" led by the Department of Education to harm Professional Massage, if the school has truly been harmed, then consideration must be given to the harm the other players might have caused. Yet, Mr. Trugman does not consider in his analysis Juliet Mee's own allegation that her school was harmed by "the governmental agencies." In fact, Mr. Trugman was never even shown Juliet Mee's Vendor Letter prior to rendering his opinion.

## VII.   CONCLUSIONS

In this lawsuit, the parties are not on an equal playing field. PMTC has a substantial burden – it must demonstrate that ACCSC's decision to revoke the school's accreditation was arbitrary, unreasonable, and not supported by substantial evidence. In this regard, PMTC must essentially prove a negative: that no evidence exists that would allow a reasonable person to reach ACCSC's decision.

The Court is well aware that, as an accreditation body, the ACCSC Commission's decision is entitled to great deference. Education accreditation is a peer-review process. Subject-matter experts conduct the review. It is not the role of the Court to second-guess the Commission's decision or to conduct a *de novo* review of the evidence. Instead, the Court's role is much more limited, even more limited than a review of an Executive Branch Agency decision.

At trial, the Court will see that substantial evidence supported the Commission's decision to terminate PMTC's accreditation in February 2012. PMTC's failure to maintain any

semblance of management continuity is the centerpiece of this evidence, and the constant turnover of staff was so egregious that the Commission was never presented with the same Management Team during subsequent reviews, starting in 2010.  Plainly, the Commission had substantial evidence before it, and the decision it reached was certainly within the realm of reason.

Trial will also demonstrate that PMTC's claimed damages is a house of cards.  Its lost profits analysis reaches astronomically-high numbers that have no connection to reality or to the school's historical performance for the past five years.  The notion that PMTC is entitled to $1.4 million in lost profits for what essentially was a lack of accreditation for 9 ½ weeks should be rejected by the Court.

At the end of the day, this case is about a school that simply could not play by the rules set forth in the *Standards of Accreditation*.  It was given multiple chances to comply, but it ultimately came up short.  Its attempt to turn that failure into a $1.4 million windfall should ultimately fail, too.

Respectfully submitted,

**ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES**

**By Counsel**

_____/ss/ Daniel D. Mauler_____

James S. Kurz (VSB #16610)
**REDMON PEYTON & BRASWELL  LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph:  (703) 684-2000 ext. 12
Fax:  (703) 684-5109
JKurz@RPB-law.com

Robert J. Martinez (*pro hac vice*)
**WILLIAMS & JENSEN PLLC**
701 8th St., N.W., Fifth Floor
Washington, DC  20001
Ph:  (202) 659-8201
JRJMartinez@wms-jen.com

Daniel D. Mauler (VSB #73190)
**REDMON PEYTON & BRASWELL  LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph:  (703) 684-2000 ext. 16
**DMauler@RPB-law.com**

Rebecca C. Larson (VSB #81455)
**REDMON PEYTON & BRASWELL LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph: (703) 684-2000 ext. 34
**Rebecca.Larson@RPB-law.com**

**CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that on July 12, 2013, I served the foregoing by electronic filing upon the

following counsel of record:

Andrew Felice (VSB No. 26277)
Maureen E. Carr (VSB No. 72802)
**REES BROOME, PC**
1900 Gallows Road, Suite 700
Tysons Corner, Virginia 22182
Telephone: (703) 790-1911
Facsimile: (703) 848-2530
E-mail: afelice@reesbroome.com
E-mail: mcarr@reesbroome.com

Ronald Holt (*pro hac vice*)
Matthew Hoppock (*pro hac vice*)
**DUNN & DAVISON LLC**
1100 Walnut Street, Suite 2900
Kansas City, MO  64106
Telephone:  816-292-7600
Fax 816-292-7601
E-mail: rholt@dunndavison.com
E-mail: mhoppook@dunndavison.com


_____/ss/ Daniel D. Mauler_____
Daniel D. Mauler (VSB #73190)
**REDMON PEYTON & BRASWELL  LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph:   (703) 684-2000 ext. 12
Fax:  (703) 684-5109
dmauler@RPB-law.com