**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

- Alexandria Division –

| | | |
|---|---|---|
| **PROFESSIONAL MASSAGE** | ) | |
| **TRAINING CENTER, INC.** | ) | |
| | ) | Case No. 1:12-cv-00911-LO-DD |
| versus | ) | |
| | ) | Post-Trial Reply: Aug. 16, 2013 |
| **ACCREDITATION ALLIANCE OF** | ) | |
| **CAREER SCHOOLS AND COLLEGES** | ) | |

# Defendant ACCSC's Post-Trial Reply Brief

August 16, 2013

**Table of Contents**

1.  **ACCSC IS A PRIVATE ENTITY, NOT A GOVERNMENTAL AGENCY.** .................. 1

2. **THE COUNT 1 DUE PROCESS CLAIM FAILS BECAUSE PMTC HAS NOT PROVEN THE ELEMENTS** ............................................................... 1

   **A.   The Due Process Theory and its Elements** .......................................... 1

   **B.   Plaintiff PMTC Fails to Prove that ACCSC Did Not Follow its *Rules of Process and Procedures* in Review of the School's Application** ................................. 3

     (1)   Staff Bias (Pl. Brief at ¶¶27-30 and 49-53) .................................... 3

     (2)   Staff Fact-Finding (Pl. Brief at ¶¶31-34) ...................................... 4

     (3)   Michael Ackerman on Evaluation Team  (Pl. Brief at ¶¶35-40) ................ 5

     (4)   Two Binders (Pl. Brief at ¶¶41-48) .......................................... 5

     (5)   Panel D/Institutional Compliance Memorandum (Pl. Brief at ¶¶54-57) ....... 6

     (6)   Student Outcomes (Pl. Brief at ¶¶58-67) ...................................... 6

     (7)   March 2012 Denial Letter  (Pl. Brief at ¶¶70-76) ........................... 7

     (8)   ACCSC Consistency (Pl. Brief at ¶¶77-78) ................................... 7

     (9)   Participation in Appeals Panel Deliberations (Pl. Brief at ¶¶79-80) ........... 8

   **C.   ACCSC'S Practices do not Require Panel Chairs to Review Decision Letters** ............ 8

   **D.   PMTC Failed to Prove that the Bases for the Commissioners' Decision are Not Supported by Substantial Evidence** .......................................... 9

     1.   The ACCSC Record Supports the Basis of the Failure to Demonstrate Continuity ............ 9

     2.   The Record Supports the Inadequate Management Decision Basis ..................... 9

3.   **DUE PROCESS CLAIM RECYCLED AS A BREACH OF CONTRACT** .................. 10

   **A.   The Terms of the "Contract"** ............................................... 10

   **B.   PMTC Fails to Prove a Material Breach by ACCSC of the "Contract"** ...................... 12

4.   **THE ECONOMIC LOSS DOCTRINE APPLIES AND BARS COUNT 3** .................. 12

5.   **PMTC HAS NOT PROVED AN ESSENTIAL ELEMENT OF THE TORTIOUS INTERFERENCE CLAIMS—COUNTS 4, 5 AND 6 MUST BE DISMISSED.** ........... 14

**6.** **PMTC FAILS TO PROVE CAUSAL CONNECTION FOR DAMAGES AND IMPROPERLY SEEKS INJUNCTIVE RELIEF** ................................................................ 15

   **A.** **Lost Students and Lost Profits: A Handful of Lost Student Enrollments** ................... 15

   **B.** **The School's Burden is to Prove Causation, Which Includes Separating Out Other Factors that Caused Student Enrollment to Decline** ........................................................ 16

   **C.** **PMTC Failed to Prove Damage to its Reputation** .............................................. 18

   **D.** **PMTC'S Unsupported Request for Injunctive Relief** ........................................ 18

**7.** **PMTC'S CLAIMS RELY ON JULIET MEE'S TESTIMONY. THE TRIAL EVIDENCE SHOWS THAT MS. MEE IS NOT A CREDIBLE WITNESS.** ........................................ 19

1.   **ACCSC IS A PRIVATE ENTITY, NOT A GOVERNMENTAL AGENCY.**

PMTC slips into its argument an unsupported assertion that the Title IV gatekeeper role "makes [ACCSC] akin to a government agency…" Pl. Brief at ¶114. This is fundamentally wrong. ACCSC is a private, non-governmental agency. ACCSC Brief at ¶1.

ACCSC previously cited the Sixth Circuit's decision in *Thomas M. Cooley Law School v. Am. Bar Ass'n*, 459 F.3d 705, 713 (6th Cir. 2006) for the point that the Court's review of accreditation decision is *more limited* than a review of governmental agency actions. The Eighth Circuit dealt with a similar "state action" issue and framed the issue this way: "What is at issue are private actions to which the government responds." *Med. Inst. of Minnesota v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1313 (8th Cir. 1987)(analyzing two Supreme Court cases with private actions resulting in a government response with a similar accreditation issue before the 8th Circuit).

In part because ACCSC is a private entity, a court has no role to review or second-guess the *Standards* themselves. As the Eighth Circuit held:

> MIM [the school] argues that NATTS' [the accreditation agency] decision to deny reaccreditation was arbitrary and unreasonable because it was based on vague standards . . . The district court found this argument unpersuasive and we agree. ***Great deference must be given to the standards used by NATTS***. The standards of accreditation are not guides for the layman but for professionals in the field of education. Definiteness may prove, in another view, to be arbitrariness. ***Strict guidelines would strip from NATTS' officials the discretion necessary to adequately assess the multitude of variables presented by different schools.***

*Med. Inst. of Minnesota,* 817 F.2d at 1314 (emphasis added).

2.   **THE COUNT 1 DUE PROCESS CLAIM FAILS BECAUSE PMTC HAS NOT PROVEN THE ELEMENTS**

   A.   <u>**The Due Process Theory and its Elements**</u>

PMTC continually avoids identifying the elements of its due process claim. To test the trial evidence, there must be a theory, and from that theory, a series of elements. ACCSC

reviewed in its Initial Brief at pp. 24-30 the case law and identified the elements necessary to prove a common law due process claim:

> ACCSC reads the law to set a two-part analysis: (1) Did the accrediting agency *not* follow its own rules and procedures? (2) is there *not* substantial evidence in the record supporting the Commission's decision?

This formulation of the elements comes from the cases stating the standard of review, primarily the above-cited *Thomas M. Cooley* case and *Wilfred Academy of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Schools*, 957 F.2d 210, 214 (5th Cir. 1992).[1] PMTC must prove a negative: That ACCSC either did not in some material way follow its own rules or that there is no substantial evidence supporting the Commission's decision.

PMTC disavows the common law due process theory. Pl. Brief at ¶114. Its substitute theory, labeled "Statutory Right to Due Process," would create a cause of action based on Department of Education regulations, specifically the Due Process regulations found at 34 CFR 602.25.[2]  The Due Process regulations cannot be the bases for a private lawsuit against an accrediting agency. It is settled law that the Higher Education Act does not authorize a private right of action by a school against an accreditation agency. *See, e.g.*, *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *Career Care Institute, Inc. v. Accrediting Bureau of Health Edu. Schools, Inc.*, No. 1:08cv1186 (AJT/JFA), 2009 WL 742532, *4 (E.D.V.A. Mar. 18, 2009). The Due Process regulations are promulgated pursuant to the Higher Education Act, 20 USC 1099b *et seq*. It is also well-settled law that a regulation cannot go

---

[1] This Court cited *Wilfred Academy* and implicitly accepted this standard in its Order granting a Preliminary Injunction. *See* Preliminary Injunction Order at 3, Sept. 17, 2012 (ECF No. 52).

[2] These regulations set forth what an accrediting agency seeking recognition by the Secretary of Education must demonstrate to show that its procedures "satisfy due process."  The regulations are general, and include "adequate written specification of its requirements," "reasonable period of time to comply with the agency's requests for information," "opportunity for a written response," and notification in "in writing of any adverse accrediting action."

beyond the authority of the authorizing statute. *See, e.g.*, *Tuan Thai v. Ashcroft*, 366 F.3d 790, 798-99 (9th Cir. 2004).

PMTC's legal theory for Count 1 is defective. In addition to no proof of the elements addressed above, certain complaints raised by PMTC as due process violations were not before the Commission prior to its decision and therefore no violation of due process can be asserted. The Court should analyze Count 1 by applying the common law due process theory.

### B.  Plaintiff PMTC Fails to Prove that ACCSC Did Not Follow its *Rules of Process and Procedures* in Review of the School's Application

ACCSC below compares PMTC's laundry list of complaints (Section 1.G of Pl. Brief, titled "Irregularities in the Re-accreditation Process") to the requisite elements of a common law due process claim. None of the complaints amount to a material violation of a provision of ACCSC's *Rules of Process and Procedures*.

(1) Staff Bias (Pl. Brief at ¶¶27-30 and 49-53)

The trial evidence shows that Juliet Mee has a difficult and mercurial personality, that she talks at length but does not listen well, and that she frequently rants and raves.[3]  It would not be surprising if ACCSC's Lisa Miles and Chris Lambert, who had some direct dealings with Ms. Mee, viewed her as PMTC's own Management Team and her attorney acknowledged.[4]  But this

---

[3] April Durnell observed: "[Juliet Mee] rants and raves a lot."  Def. Tr. Ex. #149 (A. Durnell Dep. TR) at 50:24. Rebecca Cox cited Ms. Mee's abusive behavior: "She pointed her finger at me and threatened, 'Get the fucking money in here.'" Def. Tr. Ex. #154 (R. Cox Dep. TR) at 76:19-77:17. Jessica Bell and Jeremy Beatty reported similar conduct. Def. Tr. Ex. #144 (J. Bell Dep. TR) at 219:12-220:3; Def. Tr. Ex #145 (J. Beatty Dep. TR) at 21:15-23. During the Appeals Hearing, David Harpool, PMTC's counsel, stated that Juliet Mee "rubbed some people the wrong way," and was "difficult to work for." Def. Tr. Ex. #64 (Appeal Panel Hearing TR) at 15, 31.

[4] Mr. Lambert was under subpoena by PMTC, but was never called. Because he was equally available to both sides, no adverse inference regarding his testimony is appropriate. "Moreover, when the person is equally available to both parties, the failure to produce is open to an inference against both parties, the particular strength of the inference against either depending on the facts and circumstances of each case." *Neeley v. Johnson*, 211 S.E.2d 100, 107-08 (Va. 1975).

means nothing here because there is no proof of Commissioner bias against PMTC. It was the Commissioners, not the ACCSC staff, who voted 12-0 to deny PMTC's Application.

Further, an "improper motive" of one member of a commission or panel is "insufficient to impute an unconstitutional motive on the entire commission." *Hiwasee College, Inc. v. Southern Ass'n of Colleges and Schools, Inc.,* 490 F.Supp.2d 1348, 1351 (N.D. Ga. 2007), *aff'd* 531 F.3d 1333 (11th Cir. 2008). To that effect, even if PMTC proved bias by Chris Lambert, Lisa Miles or any other *staff* member, PMTC failed to show that bias "permeated the entire" Commission so as to render the Commission's decision tainted with an improper motive.

The evidence here shows no material violation of the *Rules of Process and Procedures.*

(2)   Staff Fact-Finding (Pl. Brief at ¶¶31-34)

This complaint apparently refers to ACCSC staff members preparing the Team Summary Reports. The *Standards* provides that "[e]ach member of the on-site evaluation team contribute to the Team Summary Report…"  The evidence shows this process was followed. Trial TR (C. Moraites) at 899:23-900:4; Trial TR (L. Miles) at 68:25-69:8. Unstated in PMTC's Brief is that PMTC had the opportunity to respond to both Reports, and in fact, submitted voluminous responses. *See* Def. Tr. Ex. #36 (Response to 1st TSR) (463 pages) and Def. Tr. Ex. #53 (Reponses to 2nd TSR) (1277 pages).[5]

That staff members write the reports based on information compiled by the team members does not violate any provision in the *Standards.*

---

[5]  PMTC's allegation at n.5 is false. Staff members used the Adobe Notes features to place navigational comments in a Response. Whenever there were such notes, these were provided in discovery. Whether PMTC either read or saved the notes is unknown. If there was a problem, is it too late to raise a discovery dispute.

(3) <u>Michael Ackerman on Evaluation Team  (Pl. Brief at ¶¶35-40)</u>

Michael Ackerman's participation on the 1st Evaluation Team is covered in ACCSC's Brief

Facts at ¶¶69-71. Nothing about his participation violates the *Standards*. Indeed, the *Standards*

provided PMTC with the opportunity to object to Mr. Ackerman's participation —the school

made no objection. The *Standards* also permit a written complaint regarding an on-site

evaluation team member, which PMTC did not take advantage of.

At trial, Ms. Mee said that she complained to Lisa Miles. When asked what Ms. Mee

expected to accomplish, she said: "Well, I hoped that [Lisa Miles] would somehow talk to Mr.

Ackerman and ask him to kind of tone it down a little bit…" Trial TR (J. Mee) at 412:8-11. This

conduct does not rise to the level of a due process violation. To be sure, Ms. Mee was unsure that

she would have even filed a formal complaint. *Id.* at 412:19-21.

Nothing related to Mr. Ackerman's participation on the Team violates any provision of

the *Standards*.

(4) <u>Two Binders (Pl. Brief at ¶¶41-48)</u>

ACCSC discussed the Two Binders[6] in its Initial Brief at ¶¶66-68. The requirements for

submitting materials to the ACCSC record are plainly stated and were known to PMTC. The

facts are also that PMTC agreed that the Two Binders were not a submission to the Commission.

ACCSC Brief at ¶68. Nothing about the treatment of the Two Binders violates any provision of

the *Standards*.

---

[6] Pl. Tr. Ex. #154 (the Two Binders) is not admitted in evidence. The court reserved ruling when
it was clear that Ms. Mee neither prepared nor reviewed the contents of the binders, and thus
could not authenticate the information contained in the binders. ACCSC objected to the exhibit.

(5) Panel D/Institutional Compliance Memorandum (Pl. Brief at ¶¶54-57)

The PMTC complaint that the ACCSC staff improperly influenced Commission Panel D[7] is directly refuted by trial evidence. Trial TR (K. Mollis) at 316:25-317:2; Def. Tr. Ex. #113 (A. Sharpe Dep. TR) at 163:9-15. The Institutional Compliance Memorandum accurately stated the Panel's conclusions. Trial TR (K. Mollis) at 559:1-7. Nothing about the Panel D session, deliberations and recommendations violates the *Standards*.

(6) Student Outcomes (Pl. Brief at ¶¶58-67)

PMTC did not make an issue of its Student Outcomes[8] in any of its more than 3,400 pages of Responses. ACCSC nonetheless addressed the general issue in its Initial Brief. ACCSC Brief at n.23. PMTC first argued Outcomes in its Grounds for Appeal to excuse compliance with the mandatory management standards. Def. Tr. Ex. #62 (Grounds for Appeal) at 9-11. Now in its Post-trial Brief, PMTC asserts that the Outcomes also show management adequacy. Pl. Brief at ¶62. The argument is too late.[9]

Professional Massage failed to demonstrate compliance and failed to identify a provision in the *Standards* that is violated by the Commissioners refraining from independently researching the school's Outcomes.

---

[7] PMTC cites to portions of Mr. Sharpe's deposition not designated by either party (¶31 99:4-11, 95:8-20, ¶56 91:7-12, ¶58 137:15-20, and ¶132 95:8-20, 100:11-18). The court should not rely on these citations. This is a pattern of behavior; PMTC did the same with citations to Rebecca Cox and Jeremy Beatty. (PMTC Brief FN2 Rebecca Cox at 25:7-11 and FN2 Jeremy Beatty 188:22-194:4).

[8] The Standards address outcomes in Section VII. D.Ex.1, pp.88-92, and covers all aspects of assessment and achievement. Outcomes is one of many measuring standards, nothing in the section indicates that Outcomes are more important than other requirements, much less that good Outcomes can excuse non-compliance in other sections.

[9] Under the same heading, PMTC complains about Commissioners' notes being destroyed. Pl. Brief at ¶ 65. This was the subject of PMTC's unsuccessful Spoliation Motion. PMTC's Spoliation motion was fully briefed, complete with a full day hearing before Judge Davis. Judge Davis ruled against PMTC and PMTC did not appeal the decision.

(7) <u>March 2012 Denial Letter  (Pl. Brief at ¶¶70-76)</u>

The Commissioners voted 12-0 to deny PMTC's Application.[10]  This action was reported to PMTC in a detailed letter. Nothing in the *Standards* requires the Commissioners to write the reporting letters themselves. That the staff prepared the letter does not violate any provision of the *Standards*. Here the trial evidence confirms that the reporting letter accurately stated the Commission's decision and the bases for the decision. ACCSC Brief at ¶29 and n.3.

(8) <u>ACCSC Consistency (Pl. Brief at ¶¶77-78)</u>

The school suggests here that because the Commission accredited PMTC in 2000 and 2005 it is somehow inconsistent because it did not simply rubber-stamp the 2010 Application. Kristi Mollis testified that during the reaccreditation process, the Commission wants to "see what has gone on at the school since the last accreditation . . . and to review have they had any other issues that have been going on…" Trial TR (K. Mollis) at 549:10-15.

Much had changed at PMTC between 2005 and 2010. The school's business model was different and the school began participating in Title IV. ACCSC Brief at ¶74. During this period the school had a multi-year record of compliance failures from 2008-2011. *Id.* at ¶¶50-53. The *Standards* expressly provide that decision may be based on "information contained in the school's historical record with the Commission."  Def. Tr. Ex. #1(*Standards*) at VII.C.3.g.

Considering the record, including PMTC's history of recent compliance failures, that ACCSC did not give PMTC a reaccreditation free pass did not violate any provision of the *Standards.* Indeed, the Commission's action is fully compliant with the *Standards.*

---

[10] The school's financial troubles and stability had long been an issue. While PMTC's finances may have improved, the Commission was legitimately concerned the same issues would reappear. PMTC was on notice that its compliance history could and would be considered in the accreditation process. Def. Tr. Ex. #1 (*Standards*) at 41. There are no deviations from anything in the *Standards of Accreditation* in these actions.

(9) <u>Participation in Appeals Panel Deliberations (Pl. Brief at ¶¶79-80)</u>

PMTC misrepresents in its Brief the Appeals Panel deliberations when it refers to "the second half of the hearing." Pl. Brief at ¶79. The trial evidence was that the Panel adjourned to deliberate and several ACCSC staff members observed but did not participate. Trial TR (M. McComis) at 309:23-9. The Appeals Panel decided unanimously to deny the school's appeal. PMTC was notified in writing of the decision. Nothing about the appeal violates the *Standards*.

The *Hiwassee College* case cited above provides guidance on this issue. Hiwassee complained that a member of the Appeal Committee was part of a review of Hiwassee in the past. The court held that the key to determining the impact of the "offending" member was to "determine the impact of [the member's] presence on the Appeals Committee… and review the purpose behind the notion of common law due process as applied in the accreditation context." 490 F.Supp.2d at 1351. The court noted that the school failed to produce evidence that the member's presence "tainted the Appeals Committee." *Id.* Applied to this case, PMTC would have to prove that the presence of the observers tainted the process. PMTC has no such proof.

**C.  <u>ACCSC'S Practices do not Require Panel Chairs to Review Decision Letters</u>**

PMTC argues that Mr. Sharpe's failure to read the final version of the March 7, 2012 decision letter violates the Commission's written policies. Brief, p. 19, 66-67. There is no such requirement. Dr. McComis testified that the Panel Chair job description is not a Commission policy and does not reflect the current practice of the Commission. Trial Tr. (M. McComis) at 226:21-25.[11] Thus, no policy was violated.

---

[11] Mr. Sharpe's testimony confirms that practice by indicating that he reviewed a draft of the decision during the Commission meeting and normally does not review any subsequent drafts. Tr. 119:20-120:4. Ms. Mollis confirmed that, during her time as a Commissioner, decision letters always accurately reflected the Commissions discussions during deliberations. Tr.558:25-559:25.

**D. PMTC Failed to Prove that the Bases for the Commissioners' Decision are Not Supported by Substantial Evidence**

PMTC must alternatively prove no substantial evidence existed in the record to support the Commission's decision. PMTC turns the test on its head and argues that the record includes evidence the Commission could have found compliance. This leaves untouched and unrebutted the evidence in the record that supports the Commissioners' decision.

ACCSC has shown that there is substantial evidence to support the decision. Since PMTC does not rebut this showing, it fails to prove this prong of the common law due process test.

1. The ACCSC Record Supports the Basis of the Failure to Demonstrate Continuity

PMTC cites Juliet Mee's claim at trial, "I am the continuity at the school."  Pl. Brief at ¶89. But the record includes the school's stated—and very different—understanding of the continuity requirement. In its March 2011 Response, PMTC writes:

> [w]e understand that if we do not maintain the quality employees we have at this moment, the commission will feel that we are not meeting the standard for continuity of management in the future.

*See* ACCSC Brief at ¶34.[12]

Kristi Mollis aptly summarized the problem: "[T]he continuity issue was that there was no continuity."  ACCSC Brief at ¶45. The evidence amply supports the Commission's first basis.

2. The Record Supports the Inadequate Management Decision Basis

PMTC's argument only recites Juliet Mee's belief that the replacement team was adequate in January, 2012. Pl. Brief at ¶89. But there is no showing that the record does not include evidence that supports the Commission's decision.

---

[12] Ms. Mee also testified that PMTC never presented Ms. Mee as the answer to the continuity problem. Trial TR (J. Mee) at 735:23-736:9.

ACCSC's Initial Brief shows that the record before the Commissioners at San Diego identified a replacement team which had almost no qualifications. The unrefuted Findings from the 2nd Team Summary Report exposed Juliet Mee as not qualified to lead or manage the school in necessary areas. ACCSC Brief at ¶¶54-56. The Commission explained its reasoning for finding the team woefully unqualified with direct citations to the record.

On this stated basis for the Commission's decision, PMTC plainly fails to prove that there is no supporting evidence in the record.

## 3. DUE PROCESS CLAIM RECYCLED AS A BREACH OF CONTRACT

PMTC's alternative to Count 1 is to recycle the same facts as the contract claim. ACCSC, backed by case law from the 6th and 7th Circuits, disagrees that the *Standards* represent a contract between it and the school. *See, Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 532 (6th Cir. 2001); *Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Sch. & Colleges*, 44 F.3d 447 (7th Cir. 1994).

Assuming for this argument that the *Standards* may be treated as a contract, PMTC cannot prove its own performance, and it cannot show a material breach by ACCSC.

### A.  <u>The Terms of the "Contract"</u>

PMTC's argues is that there is a "right to due process implicit in the ACCSC [Standards]…" Pl. Brief at ¶114. This invokes the application of Virginia contract law.[13] Here the procedural and substantive terms are those plainly stated in the written agreement—there may be implied terms under law, but there are no "implied rights."  The contract would include

---

[13] A federal court sitting in diversity jurisdiction must apply the substantive law of the forum, including the forum's choice-of-law rules. Virginia's Choice of Law principles recognizes a distinction between tort and contract claims, which is summarized in *Ryder Truck Rental, Inc. v. UTF Carriers, Inc.*, 790 F. Supp. 637, 641 (W.D. Va. 1992). A contract claim is analyzed under the law of the forum where the contract was made, while a tort claim is analyzed under the law of the forum where the harm was felt. Any contract between ACCSC and PMTC would have been formed in Arlington County, Virginia.

the terms from the school CEO's certifications in the school's Application (Def. Tr. Ex. #18 at 3-4) and the *Standards.* The term "standards" is defined to include "all accreditation requirements, rules, policies, substantive standards, and appendices promulgated by the Commission and contained in the *Standards of Accreditation* document." See Def. Tr. Ex. #1 (*Standards*), Definitions at A.1. This language equates to a contractual integration clause.

The first contract element requires PMTC to prove that it has performed under the contract. For the reasons established above—that PMTC did not demonstrate it complied with mandatory standards—PMTC fails to make this showing. The school suggests that it has performed. Pl. Brief at ¶22. But the evidence shows otherwise.

The basic principles of Virginia contract law apply to construing the contract. For instance, the terms must be given "their plain and ordinary" meaning. *Heron v. Transportation Cas. Ins. Co.,* 650 S.E. 699 (Va. 2007). If the document is facially unambiguous, the court will not look beyond the "four corners" of the writing. *Double Diamond Props, LLC v. Amoco Oil Co*, 487 F. Supp.2d 737 (E.D. Va. 2007). Courts should not incorporate, *sua sponte*, additional provisions the parties may have left out of the writing. *Hutter v. Heilman,* 475 S.E.2d 267 (Va. 1996).

Significant terms in the *Standards* include:

- The school has the burden "to demonstrate continuous compliance with the *Standards of Accreditation."* (*Standards* at 8)

- The *Standards* include "requirements schools must meet . . ." (*Id.* at 63)

- Decisions on school applications "will be based upon the Commission's review of [the ACCSC record including 11 categories of materials]" (*Id.* at 40-41)

- The Commission "may revoke the accreditation of a school any time a school fails to demonstrate compliance with accreditation requirement . . . " (*Id.* at 47)

PMTC cannot rely upon an implied covenant of good faith and fair dealing to add terms or obligations that are not expressly stated. *LBCMT 2007-C3 Sterling Retail, LLC v. Sheppard,*

2013 WL 2151683, *6 (E.D. Va. May 15, 2013). PMTC nonetheless argues that it "had a right to due process implicit in ACCSC's agreement to treat it fairly." Pl. Brief at ¶114. This is mush— under its contract theory, PMTC must identify the contract terms it relies upon. It fails to do this.

**B.  PMTC Fails to Prove a Material Breach by ACCSC of the "Contract"**

PMTC claims in its Brief that ACCSC breached the "contract." Any breach relied upon must be a material breach. A material breach occurs when a party fails to fulfill an obligation in a contract that is so important and central to the contract that the failure defeats the very purpose of the contract. *Design & Prod. v. American Exhibitions, Inc.,* 820 F. Supp. 2d 727, 738 (E.D. Va. 2011); *Horton v. Horton*, 487 S.E.2d 200 (Va. 1997).

The argued breaches are a rehash of earlier PMTC arguments: (1) The denial of accreditation, (2) unfair treatment, and (3) permitting staff bias. Pl. Brief at ¶118. If the Commission has bases for its decision, then there is no breach in the denial of the Application. *See* Sections 2.C.1 and 2.C.2 above. The "unfair treatment" arguments are the same as addressed in Section 2.B above. ACCSC's response to the allegations of staff bias are in Section 2.B.(1).

Turning to terms of the "contract" identified above, the school *always* had the burden of proving its compliance. PMTC failed to demonstrate compliance and the Commissioners exercised their express authority to revoke the school's accreditation based on the failure to comply. In short, PMTC has not and cannot prove any material breach of what it claims to be a contract between the school and ACCSC.

**4.  THE ECONOMIC LOSS DOCTRINE APPLIES AND BARS COUNT 3**

PMTC claims in Count 3 that ACCSC was negligent "in its handling of PMTC's accreditation." Pl. Brief at ¶121. But in its certification as part of the PMTC Application, the school accepted ACCSC's *Rules of Process and Procedures*, and accepted it would be subject to "periodic review and a reasoned judgment by the Commission …" Now Professional Massage

wants to slip out of these certifications and wrap itself in its Count 3 negligence theory. Legally, the school has accepted the *Rules of Process and Procedures* and the substantive standards. Factually, the trial evidence does not prove ACCSC has any duty other than as stated in the *Standards*, and it does not prove that ACCSC failed to meet its duty.

The Economic Loss Doctrine is good law in Missouri. *Collegiate Enters., Inc. v. Otis Elevator Co.*, 650 F.Supp. 116, 118 (E.D. Mo.1986) ("Under Missouri law, a plaintiff cannot recover damages for economic loss on a negligence theory"). This closes the door on Count 3.

The school argues that Missouri law allows both a contract action and a tort claim. Pl. Brief at ¶121. PMTC relies on *Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 193 (2010). This case does not alter the Economic Loss Doctrine, but recognizes that only when there is a "special relationship," such as a fiduciary relationship, can both contract and tort actions for the same conduct be allowed. There is no allegation that ACCSC had a fiduciary relationship or other legally recognized "special relationship" with PMTC.

This Court's decision in *Career Care* is also on point: the plaintiff school claimed that the accrediting agency negligently violated a duty during its accreditation process. Judge Trenga dismissed the negligence claim under California's Economic Loss Doctrine. *Career Care Institute v. Accrediting Bureau of Health Educ. Schools, Inc.*, No. 1:08cv1186, 2009 WL 742532, at *5-7 (E.D. Va. Mar. 18, 2009). While the school argued that a special relationship existed, Judge Trenga rejected this argument. *Id.* at 6-7 ("The relationship between ABHES and CCI is similar to that of any institution of higher education seeking accreditation from ABHES…Inherent in this relationship is the risk that ABHES may not provide accreditation to an institution."). The same logic applies to the case at bar.

5. **PMTC HAS NOT PROVEN AN ESSENTIAL ELEMENT OF THE TORTIOUS INTERFERENCE CLAIMS—COUNTS 4, 5 AND 6 MUST BE DISMISSED.**

PMTC argues ACCSC had no "legitimate interest" in deciding the school's Application. Pl. Brief at 37-38. ACCSC clearly has a legitimate interest in deciding any application filed with the agency. After all, filing an application is an invitation to ACCSC to decide whether or not to approve the application. For Counts 4, 5, and 6, this means PMTC must prove "improper means" by ACCSC. It does not, and thus the tortious interference claims fail.

Missouri's Supreme Court identifies five elements for a tortious interference claim; one of these requires a plaintiff to prove a negative, that the defendant had a "lack of justification" for its actions. *Stehno v. Sprint Spectrum LP*, 186 S.W.3d 247 (Mo. banc 2006). This is not an inquiry of whether the action was right or wrong, but simply whether the defendant had a legitimate reason to act in the first place. *Id*. at 252. *See also Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n,* 796 S.W.2d 369, 372 (Mo. banc 1990). ACCSC may legitimately decide an accreditation application submitted by a school.

The analysis then moves to whether the defendant employed "improper means," which are those that are "independently wrongful." *Nazeri v. Missouri Valley Coll.*, 860 S.W.2d 303, 317 (Mo. 1993). It is not sufficient for PMTC to simply make conclusory allegations that ACCSC acted with improper means. *See* Pl. Brief at ¶126. Missouri requires that the specific improper means be pled and proved. *Clinch v. Heartland Health*, 187 S.W.3d 10, 17-18 (Mo. App. 2006).

The bottom line is that PMTC has not proven any improper means, and therefore it fails to satisfy an essential element of the tortious interference claims in Counts 4, 5, and 6.

6. **PMTC FAILS TO PROVE CAUSAL CONNECTION FOR DAMAGES AND IMPROPERLY SEEKS INJUNCTIVE RELIEF**

PMTC does not prove that the 9½ week suspension of accreditation (from July 11, 2012 to September 18, 2012) caused lost student enrollment beyond perhaps five students, plus another 3-5 that PMTC's Kristin Jackson believes may "be waiting because of this case." Trial TR (K. Jackson) at 595:19-25.

In addition to requiring proof of the amount of damages, the claimant must "show a causal connection between defendant's wrongful conduct and the damages asserted." *Saks Fifth Ave., Inc. v. James LTD,* 630 S.E.2d 304, 312 (Va. 2006); *TechDyn Systems Corp. v. Whittaker Corp.,* 427 S.E.2d 334 (Va. 1993) ("...a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible."). This burden is not met by showing the defendant's wrongful actions caused part of the damages claimed, rather, the plaintiff must prove the damages claimed are "solely attributable" to the defendant. *Saks Fifth Ave., Inc.,* 630 S.E.2d at 312. PMTC bears the burden to prove causation, which includes separating out the consequences of other explanatory factors.

A. **Lost Students and Lost Profits: A Handful of Lost Student Enrollments**

The trial evidence confirms that *zero* enrolled students left PMTC due to the accreditation suspension. ACCSC Brief at ¶83. PMTC's damages claim is therefore limited to lost profits clearly tied to proven loss of future student enrollment. The evidence of actual lost enrollments during the operative timeframes is Kristen Jackson's testimony that 6-10 prospective students did not enroll.[14]  Trial TR (K. Jackson) at 590:12-13. For the period after restoration of PMTC's

---

[14] This number must be discounted because the school's history shows that only a fraction of prospective students actually enroll, and after that at least 18.5% of enrollees drop-out. *See* Pl. Tr. Ex. #207 (Trugman Rebuttal Report) at 7.

accreditation, Ms. Jackson, under questioning from the Court, could only recall "three to five" "prospective students…waiting because of this case." *Id.* at 595:19-25.

Whatever the number—perhaps a total of 8-10 lost student enrollments—the damages are this number multiplied by the per student profit. The trial evidence very clearly shows $416 as the school's historical average profit per student. Thus, if there is liability, the damages are extremely modest—about $4,000. When compared to Mr. Trugman's outrageous estimate of 60 "lost students" resulting in over $950,000 in "lost profits," his numbers are exposed as factually unsupported and grossly overestimated.[15]

Following ACCSC's immediate compliance with the Court's Preliminary Injunction Order, the school was returned to its prior accredited probationary status, and was very soon Title IV eligible. Trial Tr. (J. Mee) at 347:19-21. On two prior occasions, the school had operated under Probation Order with no apparent loss of student enrollment. ACCSC Brief at ¶82. PMTC fails explain what would be different this time.

**B**. **The School's Burden is to Prove Causation, Which Includes Separating Out Other Factors that Caused Student Enrollment to Decline**

PMTC fails to answer the consequences on student enrollment of (1) PMTC's shutdown of advertising and marketing spending from *before and unrelated to* the accreditation suspension, and (2) the effect of PMTC's misleading representation of its Title IV eligibility.

*No Advertising/Marketing Spending:* Mr. Trugman eventually acknowledged that advertising and marketing do affect student enrollment. Pl. Tr. Ex. #202 at 13-26. He later stated that PMTC should reinstitute advertising to expedite its recovery. Pl. Tr. Ex. #202 at 13, d 26.

---

[15] The Trugman Analysis does not address causation because he was instructed to assume causation. Pl. Tr. Ex. #202 and #204 ("Liability is assumed in our analysis."); Def. Tr. Ex. #66 (H. Martin Report) at 9-10, ¶47 (Trugman "instructed to assume proximate cause."); Trial TR (G. Trugman) at 696:8-11.

This witness's contradictory testimony on the lack of importance of advertising diminishes his credibility. *Cf.* Trial TR (G. Trugman) 660:3-661:3, 694:16-19; Pl. Tr. Ex. #202 at 13, 26.

The school's own data confirms significant drops in student contacts *before* the accreditation suspension (total prospective contacts dropped from 183 in 2Q 2011 to 87 in 2Q 2012). Thus, the reasonable enrollment projection for a year later is 50-55 students, which is almost exactly where PMTC says it is today. *See* ACCSC Brief at ¶¶84-85. These factors likely explain either all or nearly all of PMTC's claimed drop in student enrollment.

***Misleading Information about Title IV eligibility.*** An additional factor not considered by PMTC is the outdated and incorrect information on the school's website. PMTC's Brief says that it informs its students about Title IV eligibility. Pl. Brief at ¶98. The honest statement would be that the school *misinforms* its students.[16]  The Notice Letter posted on the PMTC website in late September 2012 and still posted as of trial, is the same notice that Ms. Jackson testified she hands to every prospective student. This Notice advises a prospective student that the school *does not* currently have Title IV eligibility and that it "expects to soon receive confirmation of reinstatement . . ." Pl. Tr. Ex. #557; Trial TR (K. Jackson) at 616:21-617:2.

This long-running misinformation to students regarding Title IV eligibility can only have reduced prospective student interest, resulting in fewer enrollees. If Title IV funds are as important as PMTC argues, then this consequence could be significant. Despite the website being the source of most student contacts, the school did not make efforts to ensure the information it disseminated was correct. Trial TR (K. Jackson) at 597:21-23.

---

[16]  Screenshots of PMTC's website as of August 10, 2012 are part of Juliet Mee's email to DL Media. Def. Tr. Ex. #121. PMTC continued to promote itself as having ACCSC accreditation (*id.* at unnumbered p. 17); the school claims accreditation not by just ACCSC but by six different entities (*id.*); and, as of mid-August 2012, the next scheduled classes were for May 29, 2012 (*id.* at unnumbered p. 10). All of these oddities were dismissed by Ms. Mee as "oversights." Trial TR (J. Mee) at 799:2-13; 800:2-8; and 800:24-801:5.

**C.  PMTC Failed to Prove Damage to its Reputation**

PMTC fails to prove its damages are supported by notice of this trial or loss of reputation.

PMTC failed to produce any colorable evidence of damage to PMTC's reputation or to support

the claimed "recovery period." What did happen was Ms. Mee's pontification that the school's

reputation was damaged with no concrete examples of how it was damaged. Trial TR 470:1-24.

No testimony from witnesses, or surveys, showing that anyone had a diminished view of PMTC

or Ms. Mee were provided.[17]  Absent proof, no damages should flow.[18]

**D.  PMTC'S Unsupported Request for Injunctive Relief**

PMTC makes a request for injunctive relief, essentially contending that it should be granted

a full 5-year accreditation term. Pl. Brief at ¶115. This is invitation to turn the Court into an

accreditation agency to grant, as Dr. Karen Kershenstein described accreditation, "a status of

public recognition granted to an institution by an accrediting agency that determines the

institution meets all of the agency's standards and other requirements."  See ACCSC Brief at ¶ 7.

The evidence no way supports such a grant. Moreover, PMTC has not identified the bases on

which a court could or should take such an extraordinary step.

---

[17]   Mr. Trugman relied on "reputational experts" from other cases and Ms. Mee for his 3 year
recovery period. Trial TR 691:11-16. However, Ms. Mee vociferously testified that she does not
"know anything about how long it takes to recover your reputation," or "how long it takes to
recover a business' reputation." Trial TR 787:8-11. PMTC could have even provided local press
reports or newspaper articles indication that PMTC's "problems" were open and notorious in the
Springfield community. None were provided. None exist.

[18] Mr. Trugman admitted that he had not reviewed the claimed out-of-pocket costs for
reasonableness or audited them. Trial TR (G. Trugman) at 696:3-7. The claim for costs to
reassembly the workforce is flawed because: (a)  Mr. Beatty did not quit due to ACCSC's
actions ( Def. Tr. Ex. #145 (J. Beatty Dep. TR) at 16:11-23:10); (b) Ms. Mayhugh is still
working for PMTC(Trial TR (J. Mee) at 449:4-10) (c) PMTC did not use headhunters or pay
relocation bonuses previously; and (d) $33,000-35,000 in training costs is grossly overstated for
a qualified $65,000 employee (Trial TR (H. Martin) at150:2-152:9).

An injunction is regarded as an extraordinary remedy; it is not granted routinely. *See* Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2nd §2942. PMTC has not identified any authority on which a court should take such an extraordinary step.

This court, when asked to clarify the Injunction Order, suggested it would not be taking on the role of an accrediting agency. See ECF Dkt. Nos. 53 and 57. In its October 2012 Order (ECF Dkt. No. 72) the court ordered PMTC to "continue to comply with the *Standards of Accreditation*." Any consideration for injunctive relief would begin with whether PMTC has complied with the Order and whether it is currently in full compliance with the *Standards*.

If the Court is considering injunctive relief, then further hearings before this Court to determine PMTC's compliance and current status will be required.

## 7.   PMTC'S CLAIMS RELY ON JULIET MEE'S TESTIMONY. THE TRIAL EVIDENCE SHOWS THAT MS. MEE IS NOT A CREDIBLE WITNESS.

Professional Massage's claims rely substantially on testimony of Juliet Mee. For instance, the school's arguments on Lack of Continuity and Management Inadequacy rest on Ms. Mee's testimony that she alone provides the continuity and that she elevates the management team. It is Ms. Mee's testimony about perceived bias against her. And it is Ms. Mee's explanation on enrollment that underpins PMTC's lost profits analysis. In its efforts to be reaccredited, PMTC specifically represented that Rebecca Cox was the "full-time" Director of PMTC after June of 2011. Def. Tr. Ex. #Ex. 53 (Response to 2nd TSR) at 42. That was not true.

Ms. Mee was caught in a demonstrable untruth when she attempted to justify the Ms. Cox's firing. Ms. Mee told the ACCSC Appeals Panel that,

> …at 30 days, I realized she couldn't do the job. So in August at her evaluation I let her know this is not working for me. We need to do another evaluation and I am going to give you 60 days to make this happen. And she couldn't. She never took over any of the responsibilities of the director…I attempted to give her the title of director but it almost became a joke…

Def. Tr. Ex. #64 (Appeal Hearing Tr.) at 57:17-58:11. The exposure of the fact fabrication is in the timeline.[19]

However, PMTC reports only glowing things about Rebecca Cox in its October 8, 2011 Response to the 2nd Team Summary Report. *Id.* PMTC goes on to laud the combined team of Rebecca Cox, April Durnell, and Juliet Mee:  "the team believes the operation of the school has a positive impact throughout the organization and will continue to grow."  *Id.* at p. 685.

Whether Rebecca Cox resigned or was fired makes little difference in this case. The episode reveals Ms. Mee's willingness to twist the facts for her immediate purpose. Before the Appeals Panel, she wanted to explain away the Cox and Durnell firings by shifting blame to them. But in the school's Response to the 2nd Team Summary Report, her goal was to show the Commissioners that the Management Team with Ms. Cox was running the operation. Similarly, during her trial testimony, Ms. Mee altered the facts regarding how Durnell first joined PMTC.[20] Similarly, Ms. Mee's flip-flop on the "three year recovery period" confirms this tendency to change stories on key issues. Trial TR (J. Mee) at 479:1-6 and 786:5-22.

In Ms. Mee's testimony, the truth seems be highly flexible.

---

[19] Rebecca Cox was hired on June 27, 2011. *See* Def. Tr. Ex. #53 at 42. Thirty days from Ms. Cox's hiring is in late July 2011. According to Ms. Mee's testimony, she realized at this point that Ms. Cox "couldn't do the job." Sixty days after the first review is late September: Ms. Mee again says that Ms. Cox could not accomplish the role as school director.

[20] At trial, Ms. Mee specifically denied that PMTC hired April Durnell as a response to the 1st Probation Order or that the school even recruited Ms. Durnell: "And April approached us. And we hired her because she approached us and she was a good fit at that time. I didn't hire her because of the probation action." Trial Tr. (J. Mee) at 420:6-9. This is in stark contradiction to what PMTC said in its March 15, 2011 Response to the First Probation Order:  "April was specially recruited due to her connection with other current PMTC employees who knew of her expertise." Def. Tr. Ex. #42 (PMTC Response to Dec. 2010 Probation Order) at 25.

Respectfully submitted,

**ACCREDITATION ALLIANCE OF CAREER
SCHOOLS AND COLLEGES**

**By Counsel**

_____/ss/ Daniel D. Mauler_____

James S. Kurz (VSB #16610)
**REDMON PEYTON & BRASWELL  LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph:   (703) 684-2000 ext. 12
JKurz@RPB-law.com

Robert J. Martinez (*pro hac vice*)
**WILLIAMS & JENSEN PLLC**
701 8th St., N.W., Fifth Floor
Washington, DC  20001
Ph:  (202) 659-8201
RJMartinez@wms-jen.com

Daniel D. Mauler (VSB #73190)
**REDMON PEYTON & BRASWELL  LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph:   (703) 684-2000 ext. 16
**DMauler@RPB-law.com**

Rebecca C. Larson (VSB #81455)
**REDMON PEYTON & BRASWELL LLP**
510 King Street, Suite 301
Alexandria, VA  22314
Ph: (703) 684-2000 ext. 34
**Rebecca.Larson@RPB-law.com**

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on August 16, 2013, I served the foregoing Post-trial Reply Brief by

electronic filing upon the following counsel of record:

> Andrew Felice (VSB No. 26277)
> Maureen E. Carr (VSB No. 72802)
> **REES BROOME, PC**
> 1900 Gallows Road, Suite 700
> Tysons Corner, Virginia 22182
> Telephone: (703) 790-1911
> Facsimile: (703) 848-2530
> E-mail: afelice@reesbroome.com
> E-mail: mcarr@reesbroome.com

Ronald Holt (*pro hac vice*)
Matthew Hoppock (*pro hac vice*)
**DUNN & DAVISON LLC**
1100 Walnut Street, Suite 2900
Kansas City, MO  64106
Telephone:  816-292-7600
Fax 816-292-7601
E-mail: rholt@dunndavison.com
E-mail: mhoppook@dunndavison.com


　　　　/ss/ Daniel D. Mauler_____
Daniel D. Mauler (VSB #73190)