

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

PROFESSIONAL MASSAGE TRAINING CENTER, INC.,

        Plaintiff,

        -v-

ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES,

Civil Action No. 1-12-cv-911

## MEMORANDUM OPINION

This action was brought by the Plaintiff, a school for aspiring massage therapists, challenging the decision of the Defendant, an accrediting agency, to revoke the school's accreditation. The Court granted the Plaintiff a preliminary injunction restoring its accreditation in September 2012, and heard the case at a bench trial in July 2013.

### I.  *Factual and Procedural History*

The Accreditation Alliance of Career Schools and Colleges ("ACCSC") is a non-profit, non-stock Virginia corporation which is recognized by the Department of Education as a national accrediting agency. Recognition by the Department of Education means that ACCSC has been certified to accredit colleges and career schools, a process which vets the schools and designates those which are accredited as having exceeded a certain threshold of quality and competency. The criteria a school must meet to be accredited by ACCSC are laid out in ACCSC's own *Standards of Accreditation*, which have been approved by the Department of Education. Accreditation by an approved commission like ACCSC allows the students of accredited schools to apply for and receive financial aid under Title IV.

1

ACCSC accredits the Professional Massage Training Center ("PMTC"), a school for aspiring massage therapists in Springfield, Missouri. PMTC was founded in 1994 by Juliet Mee. Ms. Mee has owned the school and, for all practical purposes, served as its director continuously since it opened. The school's students have enjoyed employment rates significantly higher than the median among schools accredited by ACCSC.

Professional Massage Training Center first sought and received accreditation from ACCSC in 2000. In 2005, when PMTC applied to renew its accreditation, ACCSC asked the school to show that its management policies and procedures were keeping the school in compliance with ACCSC's accreditation standards. PMTC provided the necessary documents and ACCSC renewed the school's accreditation for the maximum five years.

The events which led to this litigation began when PMTC sought to renew its accreditation again in 2010. After PMTC filed its mandatory "self-evaluation report," ACCSC scheduled a team site visit to evaluate PMTC. Among the ACCSC representatives sent to evaluate PMTC on-site was Lisa Miles. After the visit, Lisa Miles sent a team summary report to PMTC detailing her findings and listing several deficiencies she observed. PMTC responded to the report by providing documents and explanations as requested in the report.

ACCSC did not consider PMTC's responses sufficient in certain areas of concern. In December 2010 ACCSC placed PMTC on probation, requiring the school to demonstrate compliance with the standards of accreditation in eleven different areas. PMTC submitted a voluminous response and also hired an additional administrator, April Durnell.

Shortly after PMTC's response, ACCSC vacated the December 2010 probation order and fully restored the school's accreditation. ACCSC then scheduled a second team site visit to the school. The second team visit, also led by Lisa Miles, resulted in a team summary report that

2

raised some of the same concerns from the first visit. Primarily, PMTC had insufficient management, was not adequately developing its learning resource center ("LRS"), and had not properly verified the employment history of several instructors so could not vouch that they were experienced enough for their roles as teachers.

Just as before, PMTC had a chance to respond and it did so. In December 2011, ACCSC again placed PMTC on probation. The second probation order listed fewer areas of concern than the first, focusing on the three subjects enumerated in the second team summary report. Just as before, PMTC submitted a response to the probation order. This time, however, ACCSC decided to revoke PMTC's accreditation. The March 2012 revocation reiterated concerns about (i) adequacy and continuity of management; (ii) sufficiency of faculty verification; and (iii) adequacy of the LRS.

PMTC appealed the revocation using ACCSC's internal appeals process. That appeal was denied in July 2012. PMTC filed this lawsuit in August 2012, seeking restoration of its accreditation and damages. The Court granted a preliminary injunction ordering PMTC's accreditation to be restored to probationary status pending the outcome of the suit, and PMTC has been on probation since.

Several sections of the road to PMTC's loss of accreditation require closer examination because they are central to PMTC's claims.

The first site visit team to visit PMTC on behalf of ACCSC was led by a man named Michael Ackerman. Mr. Ackerman was an employee of ATI Enterprises, which operates for-profit schools. At the time of the visit, ATI was embroiled in a controversy regarding improper practices, including aggressive and potentially fraudulent recruiting techniques. PMTC believes it was improper to involve Mr. Ackerman in the peer review process because of his ties to ATI.

3

PMTC considers his inclusion on the team negligent. The school buttresses its argument that Mr. Ackerman's inclusion on the team was improper with testimony from Ms. Mee that Mr. Ackerman was a large, intimidating man, and suggested her school use more aggressive recruiting techniques. He was removed as team leader in December 2010.

As a purely factual matter, the Court has not seen credible evidence to suggest that Mr. Ackerman's inclusion on the initial site visit team improperly influenced the outcome of that report, or eventually caused PMTC to lose its accreditation. Therefore the Court will not consider Mr. Ackerman further in making its determination on any of the counts.

The second site team visit, in June 2011, was led by Lisa Miles. She testified at trial that the visit lasted one day and did not include a visit to the Missouri State University library, even though Ms. Miles was aware that the school had an agreement whereby PMTC students could access MSU libraries, making those libraries part of PMTC's LRS.

Ms. Miles also testified that at the site visit she received two binders of documents responding to ACCSC's concerns. Ms. Miles testified that she read the binders before preparing her team summary report, but did not put them in the record or show them to the commission. She destroyed them at her home after reading them.

Before PMTC's reaccreditation was denied, a panel of three commissioners from ACCSC first voted, unanimously, to recommend denial. Following their recommendation, the full slate of twelve commissioners voted, again unanimously, for denial. The members of the three-commissioner panel ("Panel D") reviewed the December 2011 probation order and the school's response before the Panel D meeting. PMTC cites to testimony by panel member Mollis that he could not remember actually reading those materials. Mollis also testified, however, that it would have been the normal course of business to do so. The Court sees no reason to doubt him.

4

After Panel D's discussion and vote, staff members (not the commissioners themselves) prepared an "Institutional Compliance Summary." The summary was intended to present the Panel's findings to the rest of the commissioners before they held the full vote on PMTC's accreditation. At least one Panel D member, Allan Sharpe, did not review the staff's drafted summary before it was distributed to the full commission. Kristi Mollis, another of the Panel D commissioners, testified at trial that she had seen the Institutional Compliance Summary the night before it was presented to the full commission, but earlier at deposition she testified that she could not recall reviewing the summary before it was submitted to the full commission.

Allan Sharpe testified that the only topic of discussion at the full commission meeting was PMTC's Learning Resource System. The Court did not hear other testimony regarding the specific content of the meetings, and all commission members' notes from the meeting have been destroyed. PMTC claims this is a direct contravention of ACCSC's preservation policy. The commission voted unanimously to revoke PMTC's accreditation.

Following the vote, ACCSC staff wrote a revocation letter, which was delivered to PMTC in March 2012. The revocation letter recited the school's accreditation history and then gave two primary reasons for revoking PMTC's accreditation. First, the commission determined that PMTC "failed to demonstrate that the school ensures the continuity of management and administrative capacity through the reasonable retention of management and administrative staff." (Citing its own *Standards of Accreditation,* Section I(A)(4).) The second reason given was "PMTC failed to demonstrate that it maintains full-time or on-site supervision by an individual or team that has the demonstrated ability to lead and manage the institution." (Citing *Standards of Accreditation*, Section I(A)(1).) Within the second reason, the letter identified two direct

5

effects of the lack of adequate supervision: an inadequate learning resource system and insufficient verification of faculty qualifications.

Both of the given reasons for revocation are citations to the ACCSC *Standards of Accreditation Section I(A)*, which is dedicated to "Management and Administrative Capacity." As the Court noted in its denial of summary judgment in this case, *Section I(A)* is full of requirements of "adequate management" with "appropriate" education and experience, employed in "sufficient number," whose continuity is ensured through "reasonable retention." But *Section I(A)* does not give any definition for "adequate," "appropriate," "sufficient," or "reasonable." When pressed at trial, no witness could give a direct answer to the question of how a school should determine when it has satisfied each of those requirements, nor to the question of what metrics are used to measure sufficiency or adequacy of management and administrative capacity.

One metric which appears to have been omitted from the Panel D and full commission consideration is student outcomes. Testimony from ACCSC witnesses indicated that student outcomes were not considered in the commission's decision, and that the burden was on the school to present that evidence. Dr. McComis, head of the ACCSC, testified that if the school wished for student outcomes to be considered, it should have had its numbers certified and then "woven together a picture of the institution using those particular data sets."[1]

PMTC appealed the commission's decision in a timely manner. Its appeal was denied; the appeals panel essentially adopted the commission's findings. This action ensued.

---

[1] Dr. McComis's nonchalance regarding the usefulness of student outcomes as an indicator of successful management is somewhat puzzling in light of his doctoral dissertation, introduced by PMTC, which acknowledged the need for accreditation standards that establish "the nexus between student achievement and leadership management and capacity."

6

II.  *Analysis*

### A. Due Process Claim

PMTC's primary claim against ACCSC is that the school was entitled to due process pursuant to 34 C.F.R. § 602.25 throughout ACCSC's decision to terminate accreditation and ACCSC denied it that due process. In an action challenging an accreditation agency's revocation of accreditation, courts owe "great deference" to the agency's decision. *See, e.g., Wilfred Acad. of Hair and Beauty Culture v. S. Ass'n of Coll. and Schools*, 957 F.2d 210, 214 (5th Cir. 1992) (citing *Medical Inst. Of Minnesota*, 817 F.2d 1310, 1314 (8th Cir. 1987)); *St. Andrews Presbyterian Coll. v. S. Ass'n of Coll. & School*, 2007 WL 4219402, at *3 (M.D.N.C. Nov. 29, 2007). This is because "[t]he standards of accreditation are not guides for the layman but for professionals in the field of education." *Parsons College v. North Central Ass'n of Colleges and Secondary Schools*, 271 F. Supp. 65, 73 (N.D. Ill. 1967). In light of the deference due, "[f]ederal courts have consistently limited their review of decisions of accrediting associations to whether the decisions were arbitrary and unreasonable . . . ." *Wilfred Acad.*, 957 F.2d at 214 (internal quotes and citations omitted).

Arbitrary and unreasonable is a high bar. Similar to a court's review of an agency decision, this Court owes great respect to the expertise of the commissioners at ACCSC. Further increasing the degree of difficulty of Plaintiff's claim, the burden of proof rested with the school to prove itself worthy of reaccreditation. The burden also rests with the school on this appeal. Accordingly, this Court will only overturn the ACCSC decision if PMTC demonstrated at trial that: (i) it presented relevant material to the panel that the panel failed to consider; (ii) that the panel relied on information which was incorrect or irrelevant; or (iii) that the panel failed to adhere to its own procedures and policies in making its determination.

Keeping respect for the deference owed accrediting agencies in mind, this Court is not swayed by ACCSC's argument that accreditation is a voluntary process and the resulting implication that no due process is owed to the schools before revocation. The accrediting agencies are gatekeepers to Title IV financial aid funds administered by the Department of Education. Revoking a school's accreditation has a severe impact on the business outlook of the school because it eliminates the source of funding of many potential students. Indeed, a majority of the students at PMTC rely on Title IV funds. While accreditation is indeed voluntary, an accrediting agency may not (as reflected in the case law) revoke a school's accreditation in an arbitrary and unreasonable manner.

     i.   *Learning Resource Center*

Although ACCSC's revocation letter grouped adequacy of the LRS and faculty verification together under the broader heading of adequate full-time supervision by a qualified individual or team, it is helpful to consider the LRS and faculty verification separately.

During ACCSC's 2011 site team visit, the team was aware that PMTC had made an agreement with nearby MSU to give PMTC's students access to the MSU library facilities. The record does not indicate how large the MSU library is, but the Court is confident it is extensive, and almost certainly larger than PMTC's private collection. Despite this expansion of the PMTC's library offerings, the site team declined to visit the MSU library during its visit.

This is significant because the 2011 site team visit was ACCSC's sole chance to lay eyes on PMTC's complete LRS. The site team's (particularly Lisa Miles's) determination that the school's LRS was inadequate was passed along through the accreditation review process, and was ultimately cited as one of the major reasons PMTC's accreditation was revoked.

8

As an aside, the Court is skeptical that the library collection of a school for massage therapists must be huge. And it is not clear that at any point PMTC's LRS was evaluated by an individual with specific knowledge of the library needs of a massage school. The Court will not substitute its own judgment for that of the expert commission on this point, but it will note that ACCSC has not demonstrated any quantitative standards it uses to evaluate the sufficiency of an LRS, for example number of books, or number of computer terminals available; the determination is apparently subject to the collective expertise of the commission.

What is most concerning to the Court is that the commission passed on its one opportunity to actually apply its expertise and directly evaluate the quality and magnitude of PMTC's LRS. To deem the LRS inadequate without having examined it is arbitrary by definition.

Despite the incomplete evaluation, ACCSC relied heavily on the "inadequate" LRS as a ground for denying accreditation. Indeed, ACCSC cited the LRS not only as a standalone violation of the *Standards of Accreditation*, but also as some of the evidence it relied upon in determining that the school lacked adequate management and administrative capacity (which was treated as a separate violation). It is possible that the commission might have found the information it needed to properly evaluate the LRS in the binders PMTC gave to Lisa Miles at the second site team visit, and Allan Sharpe testified that those binders should have been passed along to the commission. But the binders were never made part of the record and were instead destroyed.

Because the revocation letter lacks detail and the metrics used to evaluate adequate management and administrative capacity are not clear, it is impossible to determine from the revocation letter exactly how much of a factor the LRS played in the commission's decision.

9

More than a full page of a ten-page letter was dedicated to the LRS, and no other consideration was given nearly that much space. Also, Allan Sharpe testified that the LRS was the primary subject of conversation at the commissioner's meeting. The Court finds therefore that it was a very significant factor. The Court considers not visiting PMTC's LRS but then using its alleged inadequacy to demonstrate failings of the school's management to be an arbitrary and unreasonable action by ACCSC.

      ii.   *Experience Requirements*

Besides inadequate LRS, the other example ACCSC used to show the effect of inadequate onsite supervision was PMTC's alleged failure to properly verify the qualifications of its faculty and staff. Curiously, ACCSC did not submit any proposed findings of fact related to PMTC's alleged failure to verify the work history and experience of its faculty and staff. The Court assumes this is because the evidence adduced at trial tended to show that PMTC had made good faith efforts to verify the work history of its employees in situations where, for example, the previous employer had gone out of business. Similarly, testimony indicated that when PMTC showed flexibility in its experience requirements it was due to offsetting strengths of an individual candidate in other areas. And besides, the experience "requirements" were self-imposed by PMTC—they were not ACCSC mandates.

To the extent ACCSC revoked PMTC's accreditation because the school was flexible on the experience requirements it set itself for given positions, that action was arbitrary and unreasonable. If ACCSC had independent experience requirements for certain positions, then revocation might be proper when schools violate those requirements. But that is not the case here.

iii.  *Inadequate Management*

The other concerns outlined in ACCSC's revocation letter can be considered together as PMTC having inadequate management which was not reasonably retained to provide sufficient continuity.

Juliet Mee has been the primary manager of PMTC since she founded the school in 1994. There is no dispute that she has headed the school continuously since then.[2] Over nearly twenty years she has built the school into a successful training ground for aspiring massage therapists. PMTC's graduation rates are good, and its job placement rates are excellent. The school enjoys high satisfaction ratings from its students, and has taken corrective steps along the way when student satisfaction fell in specific areas. PMTC was accredited by ACCSC in 2000, and reaccredited in 2005, all under Ms. Mee's leadership. It is a self-validating statement that a woman who built and continues to run a successful massage school that survived and even thrived through two recessions is adequately qualified to run a massage school. Her score on whatever scale is used to evaluate continuity could not be any higher—she has been in charge from day one.

For two reasons, the Court is suspicious of ACCSC's claims that Ms. Mee did not have adequate administrative staff around her with sufficient continuity to comply with the standards. First, the *Standards of Accreditation* do not require multiple staff members. Section I(A)(1)(a) requires "[f]ull-time on-site supervision by an *individual or team* with the appropriate . . . education, experience, and demonstrated ability to lead and manage a post-secondary education institution . . . ." (emphasis added). An individual can satisfy Section I(A)(1)(a), and the previous paragraph describes why Juliet Mee is clearly an appropriate individual.

---

[2] In some of its prior briefs, ACCSC emphasized a staff meeting when Ms. Mee fired everyone, including herself. Although not much trial time was spent on that meeting, the Court reads the mass firing as a motivational technique, not an actual abdication of control over the school by Ms. Mee.

Later in the same section *Standard* I(A)(1)(d) requires "[a] sufficient number of managers and administrative employees necessary to support the school's operations, student services, and educational programs . . . ." This standard is internally inconsistent. To require a sufficient number of managers is much different than requiring the necessary number of managers. The Court does not make this observation to sharpshoot the drafting of ACCSC's standards, but to highlight failure of the *Standards* to define what is "sufficient" or "necessary," and the lack of evidence at trial as to what those terms objectively mean in this context. Does a school PMTC's size and scope require one manager? Twenty? No witness could answer that question when asked directly. Put simply, the Court cannot imagine how a school seeking to gain or maintain accreditation would obtain practical guidance from the *Standards*.

It appears that schools must turn to the experts at ACCSC to interpret the *Standards* and tell the school whether the current management team and administrative staff is sufficient, and then adapt based on the answer. After listening to the testimony at trial, it seems to the Court that PMTC was trying to do exactly that, and the result was the high turnover in staff over the last two years of the school's accreditation. The school tried to rapidly hire additional staff to accommodate ACCSC's demands and, through a combination of haste and bad luck, had trouble filling the positions satisfactorily.[3]

A common theme among ACCSC's witnesses was that even if PMTC had adequate management to effectively run a massage school, it did not have enough management and staff of sufficient experience to comply with various intricacies of the accreditation process. In other words, PMTC lost its accreditation because it was not adept enough at maintaining its accreditation. This is troubling from a bureaucratic standpoint, and the Court is also satisfied by

---

[3] In various correspondences with ACCSC and other educational authorities, Ms. Mee wrote that she knew PMTC had insufficient staff along with other problems. The Court reads these as conciliatory, diplomatic statements, not as admissions of noncompliance.

the evidence that it is untrue. PMTC complied with all deadlines throughout the accreditation process, and received waivers for late submissions when they missed deadlines. The school complied with ACCSC's requests for site visits and provided huge amounts of documents and data to ACCSC throughout the process. The Court did not hear any concrete examples of ways in which PMTC failed to adhere to the accreditation process, except—circularly—by failing to have sufficient staff to comply with the accreditation process.

Much was made of the evidence that ACCSC's staff was biased against Ms. Mee and that they intentionally drafted the report in a negative light to cause the commissioners to vote to withdraw PMTC's accreditation. There is ample evidence to support that assertion. Clearly the staff under the direction of Ms. Miles drafted the reports regarding their visits without input or supervision by Dr. McComis or the commissioners. ACCSC staff members openly ridiculed Ms. Mee's interaction with ACCSC employees during much of the reaccreditation process and were clearly sick of dealing with her. Staff members openly debated putting damning statements about her in the report and then did so although some allegations were unsupportable. They also embedded their own comments they knew they could not justify about whether the school was in noncompliance in reports provided to the commissioners, in both instances to hopefully guarantee that the commissioners would vote to deny accreditation. Then, they openly celebrated when the school's accreditation was in fact withdrawn. The staff also incorrectly characterized the turnover in management as resulting from Ms. Mee's management style.  The record does not support their conclusion that employees Ms. Cox and Ms. Durnell were fired for reasons other than just cause. The staff criticism that the last two management hires were unqualified for their duties for PMTC lacked any substantive basis. It is simply incredible that they were hired at ACCSC's urging and then sent for training by ACCSC and then found unqualified for non-

13

meritorious reasons. Because the commissioners did no independent investigation and based their opinions on the staff work, their votes carry no weight. Deeply negative staff bias against Ms. Mee completely infected the record that the commission reviewed and as a result denied PMTC due process.

After hearing all of the evidence, the Court finds that it was arbitrary and unreasonable to deem PMTC's management inadequate in number and continuity when Ms. Mee's leadership had been satisfactory twice before and the school continued to operate at a high level of effectiveness. The recent high turnover in staff was the direct result of ACCSC placing new staffing requirements on PMTC, and PMTC scrambling to satisfy those requirements.

To summarize, ACCSC's decision to revoke PMTC's accreditation was based on an inadequate LRS that ACCSC didn't visit, the school's reasoned flexibility in applying its own faculty experience requirements, and application of a vague standard to find the same management that had previously been adequate is now inadequate. The Court considers these bases arbitrary and unreasonable, so finds in favor of PMTC on Count I of the complaint.

### B. Additional State Law Claims

Having found PMTC entitled to relief under its due process claim, the Court turns briefly to the school's state law claims.

In addition to its due process claim, PMTC alleged the following in its amended complaint: breach of contract (Count II); negligence (Count III); and tortious interference with various contracts (Counts IV through VI). In reviewing these additional allegations the Court must first determine what law governs each claim. To do so, the Court must look to Virginia's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Under those

14

rules the nature, validity, and interpretation of a contract is governed by "the law of the place where made." *See Hunter Innovations Co. v. Travelers Indem. Co. of Connecticut*, 753 F.Supp.2d 597, 602-03 (E.D.Va. 2010) (citations omitted). A contract is "made at the place where the final act is done which is necessary to make the contract binding." *Id.* (internal quotations omitted). According to these principles, the Court must review PMTC's breach of contract claim under Virginia law. A different choice of law rule applies to PMTC's tort claims (Counts III through VI). For those claims, Virginia applies "the law of the place of the wrong." *See Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998). Accordingly, the Court must review PMTC's remaining tort claims under Missouri law.[4]

In defending against PMTC's breach of contract claim, ASSCS argues that PMTC cannot point to any contract breached between the parties. ASSCS additionally argues that if any such contract does exist, PMTC has failed to point to a specific clause or condition violated. The Court agrees. Even assuming that the *Standards* form a binding contract between the parties, PMTC has not pointed to a specific clause breached. Therefore, PMTC's contract claim is best read as accusing ASSCS of breaching an implied covenant of good faith and fair dealing. Virginia law, however, does not recognize this implied covenant and thus PMTC's contract claim fails. *See, e.g., LBCMT 2007-C3 Sterling Retail, LLC v. Sheppard*, Case No. 1:12-cv-470, 2013 WL 2151683 (E.D.Va. May 15, 2013) (citing *L & E Corp. v. Days Inns of Am., Inc.*, 992 F.2d 55, 59 n.2 (4th Cir. 1993)).[5]

---

[4] The parties agree that Missouri law governs the tort claims. PMTC mistakenly argues that, because the tort claims are governed by Missouri law, the contract claims are as well. PMTC does not, however, debate that any contract it may have with ASSCS was formed in Virginia. Accordingly, the Court agrees with ASSCS that Virginia law governs Count II.
[5] PMTC challenges this finding by referencing *Career Care Inst., Inc. v. Accrediting Bureau of Health and Ed. Schools, Inc.*, Case No. 1:08-cv-1186, 2009 WL 742532 (E.D.Va. Mar. 24, 2009). While the court in *Career Care* did find an implied duty of good faith under similar facts, it did so under California contract law. *Id.*

As an alternative to its breach of contract claim, PMTC asserts that ASSCS negligently breached a duty to PMTC. This claim is foreclosed by the economic loss doctrine. Under Missouri tort law "a plaintiff cannot recover damages for economic loss on a negligence theory." *See, e.g.*, *Collegiate Enter., Inc. v. Otis Elevator Co.*, 650 F.Supp. 116, 118-19 (E.D.Mo. 1986) (citations omitted). As PMTC points out, the economic loss doctrine does not apply when a "special relationship" exists between the parties. *See Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184, 192-94 (Mo.App. S.D. 2010). Yet there is no basis for asserting that PMTC and ASSCS entered into a special relationship.[6]

PMTC's final three counts are based on a theory of tortious interference. To prove tortious interference under Missouri law PMTC must show: (1) a contract or valid business expectancy, (2) defendant's knowledge of the contract or relationship, (3) a breach induced or caused by defendant's intentional interference, (4) absence of justification, and (5) damages. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. 1993) (citing *Comm. Title v. Roosevelt Fed. Sav. & Loan*, 796 S.W.2d 369, 372 (Mo. banc 1990)). PMTC cannot show the fourth element, lack of justification. There is no question that—under certain circumstances, for the correct reasons, and through the appropriate procedures—ASSCS had a legal right to rescind PMTC's accreditation. In other words, it is not *what* ASSCS did but *how* they did it. As Missouri law makes clear, a plaintiff cannot maintain a claim for tortious interference when the defendant had "an unqualified legal right to do the act complained of." *Id.* Because ASSCS had "an unqualified legal right" to rescind PMTC's accreditation, the school's tortious interference claims fail.

---

[6] Here, unlike the contract claim, Judge Trenga's decision in *Career Care* is instructive as the economic loss doctrine operates similarly in California. *See Career Care*, 2009 WL 742532 at *7 (applying the economic loss doctrine and finding that no special relationship existed between an educational institution and accreditation agency).

## IV.   *Damages*

Having found PMTC entitled to relief under Count I, the Court now turns to the issue of damages. As a preliminary matter, the Court sees no basis for awarding PMTC punitive damages in this case. The Court does find, however, that PMTC is entitled to recover the profits it would have likely gained had it not lost its accreditation. Under Missouri law, anticipated profits may be recovered when "they are made reasonably certain by proof of actual facts, with present data for rational estimate of their amount." *See Indep. Bus. Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 703 (8th Cir. 1997) (citing *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968)). The task before the Court, therefore, is calculating PMTC's anticipated profits to a reasonable degree of certainty.

In its complaint PMTC claimed that it has suffered damages in an amount of at least $1,000,000.00. Both parties presented experts in order to assist the Court in making a "rational estimate" of the losses sustained by PMTC due to ACCSC's actions. Unsurprisingly, the experts varied dramatically in their assessments. At trial PMTC's expert argued that PMTC suffered total damages of over $1,400,000.00. ACCSC's expert did not offer a specific valuation, but disagreed with almost every aspect of PMTC's expert's analysis.

Three particular areas of disagreement stand out in importance and require this Court's resolution. First, the experts disagreed as to whether student enrollment at PMTC was cyclical or countercyclical in relation to changes in the overall economy. Second, the experts disagreed about the relationship between student enrollment and accreditation, and how long PMTC would suffer reputational damage due to its loss of accreditation. Finally, and most significantly, the experts offered vastly different estimates of PMTC's historic profit rate. ACCSC's expert

indicated that PMTC's profit rate historically hovered below 3% while PMTC claimed its profit rate for the foreseeable future was above 90%. *See* Tr. 1056:07-16.

As to the first area of disagreement, PMTC's expert argued convincingly that student demand for PMTC runs cyclically to the overall economy in general and Gross Domestic Product ("GDP") specifically. *See* Tr. 638:08-23. The Court is also convinced that accreditation is linked to student enrollment rates and finds that it would take PMTC three years to recover its reputation fully. *See* Tr. 648:01-15. Thus damages should be assessed from the year in which accreditation was lost (2012) until approximately three years from the close of this litigation (2016).

As to the final point of disagreement, the Court takes issue with both experts' analysis of PMTC's historic profit rate. The relevant period of comparison in estimating anticipated profits is between 2007 and the close of 2011. *See* Tr. 1069:09-12.[7] This five-year period, however, contains a significant aberration. In 2010 PMTC suffered a pre-tax profit *loss* of $221,751.00. PMTC's expert chose to completely remove 2010 from his assessment of PMTC's historical profit rate. ACCSC's expert included the aberrational year in its entirety, noting that PMTC "had an actual loss of approximately $222,000.00. I don't think you just wipe the slate clean and ignore it." *See* Tr. 1067:01-6. The Court agrees that the 2010 loss should not be ignored, but finds it unreasonable to include the loss fully in making a projection. Having conducted its own calculations, the Court finds that a proper projected rate of profit is 4.7%.[8]

---

[7] This period begins when PMTC doubled its tuition rates to roughly $18,000.00 and ends when PMTC lost its accreditation.

[8] When 2010's lost profits are included, PMTC had a profit rate of 2.68%. *See* PMTC 5-Year Performance 2007-2011, Dkt. No. 255-3. When 2010's loss is entirely excluded, PMTC had a profit rate of over 7% between 2007 and 2011. *Id.* Referencing ACCSC's expert's report, it is clear that "Bad Debts" played a significant role in PMTC's 2010 losses. Accordingly the Court looked at the ten year bad debt average, not including 2010, to determine a more reasonable forecast. In the nine years between 2002 and 2011, not including 2010, PMTC's average bad debt expense was approximately $17,951.78. The 2010 bad debt expense was $158,507.00, some $140,555.22 *above* the average bad debt expenses PMTC typically paid. The Court finds that increasing PMTC's 2010 lost profits by this

With these findings in mind, the Court now turns to calculating PMTC's damages due to its lost accreditation.

In 2011 PMTC enrolled 94 students. Given the country's anemic GDP growth rate, the Court finds that it is appropriate to assume enrollment rates were set to increase around 2.5% per year.[9] Therefore, had PMTC not lost its accreditation in 2012, it could have reasonably expected the following enrollment through 2016

| YEAR | PROJECTED ENROLLMENT |
|------|---------------------|
| 2012 | 96 |
| 2013 | 98 |
| 2014 | 100 |
| 2015 | 103 |
| 2016 | 106 |

Relevant evidence shows that PMTC's revenue per student between 2007 and 2011 was roughly $15,536.89. *See* PMTC 5-Year Performance, 2007-2011, Dkt. No. 255-3. Considering the projected enrollment calculations and revenue per student assessment, along with an assumed 4.7% rate of profit, PMTC's expected profits for the period in question would be $367, 307.62. The following chart summarizes the Court's anticipated profits projections

| YEAR | PROJECTED ENROLLMENT | PROJECTED REVENUE | PROJECTED PROFIT |
|------|---------------------|-------------------|------------------|
| 2012 | 96 | 1,491,541.44 | 70,102.45 |
| 2013 | 98 | 1,522,615.22 | 71,562.92 |
| 2014 | 100 | 1,553,689.00 | 73,023.38 |
| 2015 | 103 | 1,600,299.67 | 75,214.08 |
| 2016 | 106 | 1,646,910.34 | 77,404.79 |
| TOTAL | | | $367,307.62 |

amount is a reasonable method for neither overemphasizing the 2010 loss, nor ignoring it. Under this method PMTC's 2010 loss was approximately $81,195.78, giving the organization a five-year profit rate of approximately 4.7%. The Court finds this 4.7% rate of profit to be a far more reasonable estimate than the roughly 90% or 3% rate offered by the Plaintiff and Defendant's experts respectively.

[9] *See* Economic Projections of Federal Reserve Board Members and Federal Reserve Bank Presidents, September 2013, http://www.federalreserve.gov/monetarypolicy/files/fomcprojtabl20130918.pdf (last visited 11/14/2013).

In addition to lost expected profits, the Court credits PMTC's expert's assessment that PMTC suffered $41,709.00 in expenses due to litigation.[10] PMTC's claim that it will cost over $100,000.00 to "reassemble" its workforce, however, is without merit. As ACCSC's expert pointed out, it defies logic to think that PMTC would spend $26,000.00 on headhunters who would find untrained candidates, thus requiring PMTC to spend significant additional funds training such candidates. *See* Tr. 1050:09-1051:02. The Court instead finds that $20,000.00 reasonably reflects the cost PMTC will incur in returning its workforce to pre-2012 levels.

Therefore, in total, the Court awards PMTC $429,016.62 in damages (as summarized in the table below).

| ITEM | DAMAGES AWARDED |
|---|---|
| Lost Anticipated Profits | $367,307.62 |
| Litigation Expenses | $41,709.00 |
| Workforce Reassembly | $20,000.00 |
| **TOTAL DAMAGES:** | **$429,016.62** |

## V.    *Conclusion*

For these reasons, the Court finds in favor of the Plaintiff on Count I and awards the Plaintiff $429,016.62 in damages. The Court finds that the Plaintiff is not entitled to further relief under its additional state law claims. Furthermore, the Court finds that the Defendant's March 2012 decision to revoke Plaintiff's accreditation should be vacated and that PMTC be granted continued accreditation until the next normal review cycle. ACCSC may follow its standard procedures for its accredited schools for obtaining information from PMTC to be used in its next review.

An appropriate order shall issue.

January 17, 2014
Alexandria, Virginia

_____
/s/
Liam O'Grady
United States District Judge

---

[10] This number does not include attorney's fees.